**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2548
_____

UNITED STATES OF AMERICA,
Appellant

v.

HARRY KATZIN; MICHAEL KATZIN; MARK LOUIS
KATZIN, SR.


_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. Action No. 5:11-cr-00226)
District Judge: Honorable Gene E.K. Pratter
_____

Argued March 19, 2013
_____

Before: SMITH, GREENAWAY, JR., and VAN
ANTWERPEN, *Circuit Judges*.

(Opinion Filed: October 22, 2013)
_____

Robert A. Zauzmer, Esq. [ARGUED]
Emily McKillip, Esq.
Zane D. Memeger, Esq.
Thomas M. Zaleski, Esq.
Office of United States Attorney
615 Chestnut Street Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellant The United States of America*


Thomas A. Dreyer, Esq. [ARGUED]
6 Dickinson Drive, Building 100
Chadds Ford, PA 19317-0000
        *Counsel for Appellee Harry Katzin*

William A. DeStefano, Esq.
Stevens & Lee
1818 Market Street, 29th Floor
Philadelphia, PA 19103-0000
        *Counsel for Appellee Michael Katzin*

Rocco C. Cipparone, Jr., Esq. [ARGUED]
205 Black Horse Pike
Haddon Heights, NJ 08035-0000
        *Counsel for Appellee Mark Louis Katzin, Sr.*

Benjamin E. Wizner, Esq.
American Civil Liberties Union
National Security Project
125 Broad Street, 18th Floor

New York, NY 10004

Catherine N. Crump, Esq. [ARGUED]
Nathan Wessler, Esq.
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
     *Counsel for Amicus Appellees the American Civil*
*Liberties Union Foundation*

Witold J. Walczak, Esq.
Sara J. Rose, Esq.
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA 15213-0000

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
     *Counsel for Amicus Appellees the American Civil*
     *Liberties Union Foundation of Pennsylvania*

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004

Hanni M. Fakhoury, Esq.
Marcia Hoffman, Esq.
Electronic Frontier Foundation
815 Eddy Street

San Francisco, CA 94109
    *Counsel for Amicus Appellees the Electronic Frontier Foundation*

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003

Catherine N. Crump, Esq. [ARGUED]
American Civil Liberties Union
125 Broad Street, 17th Floor
New York, NY 10004
    *Counsel for Amicus Appellee the National Association of Criminal Defense Lawyers*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

This appeal stems from the Government's warrantless installation of a Global Positioning System device (a "GPS device" or "GPS tracker") to track the movements of Appellee Harry Katzin's van. Harry Katzin, along with his brothers Mark and Michael (collectively, "Appellees"), claims that attaching the GPS device without a warrant violated the Fourth Amendment. The United States Government ("Appellant" or "Government") argues that: (a) a warrant is not required to install a GPS device; (b) even if a warrant were required, the police were acting in good faith; and (c) in any case, Mark and Michael lack standing to

4

contest admissibility of evidence recovered from Harry Katzin's van.

The instant case therefore calls upon us to decide two novel issues of Fourth Amendment law: First, we are asked to decide whether the police are required to obtain a warrant prior to attaching a GPS device to an individual's vehicle for purposes of monitoring the vehicle's movements (conduct a "GPS search"). If so, we are then asked to consider whether the unconstitutionality of a warrantless GPS search may be excused for purposes of the exclusionary rule, where the police acted before the Supreme Court of the United States proclaimed that attaching a GPS device to a vehicle constituted a "search" under the Fourth Amendment. For the reasons discussed below, we hold that the police must obtain a warrant prior to a GPS search and that the conduct in this case cannot be excused on the basis of good faith. Furthermore, we hold that all three brothers had standing to suppress the evidence recovered from Harry Katzin's van. We therefore will affirm the District Court's decision to suppress all fruits of the unconstitutional GPS search.

## I. FACTS AND PROCEDURAL HISTORY

Given that the issues in this matter touch upon several forms of electronic tracking devices, we feel it necessary — in service of our forthcoming analysis — to embark on a brief discussion of the relevant technology before delving into the specific circumstances surrounding Appellees.

## A.    Tracking Technology

This case concerns a "slap-on" GPS tracker, so called because it magnetically attaches to the exterior of a target vehicle, is battery operated, and thereby requires no electronic connection to the automobile.  The tracker uses the Global Positioning System — a network of satellites originally developed by the military — to determine its own location with a high degree of specificity and then sends this data to a central server.  This check-and-report process repeats every few minutes (depending on the tracker), thereby generating a highly accurate record of the tracker's whereabouts throughout its period of operation.  The great benefit of such a system — apart from its accuracy — is that anyone with access to the central server can analyze or monitor the location data remotely.  These aspects make GPS trackers particularly appealing in law enforcement contexts, where the police can attach a tracker to some vehicle or other asset and then remotely monitor its location and movement.

GPS technology must be distinguished from the more primitive tracking devices of yesteryear such as "beepers." Beepers are nothing more than "radio transmitter[s], usually battery operated, which emit[] periodic signals that can be picked up by a radio receiver." *United States v. Knotts*, 460 U.S. 276, 277 (1983).  In contrast to GPS trackers, beepers do not independently ascertain their location — they only broadcast a signal that the police can then follow via a corresponding receiver.  Moreover, beeper signals are range-limited: if the police move far enough away from the beeper, they will be unable to receive the signal that the unit broadcasts.  At bottom, then, beepers are mere aids for police officers already performing surveillance of a target vehicle. Unlike GPS trackers, beepers require that the police expend

6

resources — time and manpower — to physically follow a target vehicle.

## B.   The Brothers Katzin

A spectre was haunting Delaware, Maryland, and New Jersey in 2009 and 2010 — the three states had been hit by a wave of pharmacy burglaries, many of which affected Rite Aid pharmacies.  The method used in the various crimes was largely consistent: in many cases, the alarm systems for the pharmacies would be disabled by cutting the external phone lines.  The local police approached the FBI for help (collectively, "the police") and the hunt was on.

By mid-May 2010, a suspect emerged: a local electrician named Harry Katzin.  Not only had he recently been caught burglarizing a Rite Aid pharmacy, but he and his brothers — Mark and Michael — had criminal histories that included arrests for burglary and theft.  Over the course of the following months, the joint state and federal investigation began receiving reports of seeing Harry Katzin around Rite Aid pharmacies throughout the three states.  For example, in late October 2010, local police in Pennsylvania encountered Harry Katzin crouching beside some bushes outside of a Rite Aid after responding to reports of suspicious activity.  The police did not arrest him, but discovered the next day that the phone lines to the pharmacy had been cut.  The next month, Harry Katzin, along with one of his brothers and one other individual, was approached by the police as he sat outside of a different Rite Aid in his Dodge Caravan.  After Harry Katzin consented to a search, the police discovered electrical tools, gloves, and ski masks.  Harry Katzin explained that these were tools of the electrician's trade and the police allowed the men to leave.  The telephone lines to this Rite

Aid had also been cut.  Soon thereafter, the police obtained footage of another recently burglarized Rite Aid showing that a vehicle similar to Harry Katzin's van had been parked outside for a long period of time.  As the pieces began falling into place, the police proceeded with their next step: electronic tracking.  The police knew that Harry Katzin regularly parked his van on a particular street in Philadelphia.  Thus, in the early hours of a mid-December morning, after consulting with the United States Attorney's office, but without obtaining a warrant, the FBI affixed a "slap-on" GPS tracker to the exterior of Harry Katzin's van.

While the police do not appear to have set a time limit for using the GPS tracker, the device yielded the results they were after within several days.  According to the tracker, Harry Katzin's van had left Philadelphia on the evening of December 15, 2010, and had traveled to the immediate vicinity of a Rite Aid in a neighboring town.  Through use of the device, the police could see that the van had been driven around the town for several minutes before parking at a specific location for over two hours.  That's when the FBI began to tighten the net.  They alerted local police as to Harry Katzin's whereabouts, but cautioned them not to approach too closely for fear of tipping off either Harry Katzin or any individual he may have been traveling with.  When the FBI noticed that the van was once again on the move, the call came in: the van was to be taken.

While state troopers stopped Harry Katzin's van on a Pennsylvania highway, a squad of local police officers investigated the Rite Aid closest to where Harry Katzin's van had been parked; they found that it had been burglarized and relayed this information to the troopers.  Inside the van, troopers found Harry at the wheel, with Mark and Michael as

8

passengers. From outside of the van, the troopers could see merchandise and equipment from the burglarized Rite Aid, including pill bottles and Rite Aid storage bins. The police impounded the van and arrested the Katzin brothers.

All three brothers moved to suppress the evidence discovered in the van. The Government opposed the motions, arguing: (a) that a warrant was not required for use of the GPS device; (b) that the police had acted in good faith when installing the GPS device; and (c) that Mark and Michael lacked standing to challenge the GPS search and therefore could not move to suppress any of the evidence. The District Court held in favor of the brothers and suppressed all of the evidence found in the van. *United States v. Katzin*, No. 11-226, 2012 WL 1646894, *11 (E.D. Pa. May 9, 2012). This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction to hear this case pursuant to 18 U.S.C. § 3231; our jurisdiction stems from 18 U.S.C. § 3731. In reviewing a district court's ruling on a motion to suppress, "we review [the] court's factual findings for clear error, and we exercise *de novo* review over its application of the law to those factual findings." *United States v. Pavulak*, 700 F.3d 651, 660 (3d Cir. 2012) (citing *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006)).

## III. GPS SEARCHES AND THE WARRANT REQUIREMENT

The Fourth Amendment mandates that

[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Prior to 1967, the Supreme Court of the United States interpreted this language generally to mean that the Fourth Amendment prevented the police from physically intruding upon an individual's private property for purposes of conducting a search (the physical intrusion theory). *See United States v. Jones*, 132 S. Ct. 945, 949-50 (2012); *see also, e.g.*, *Olmstead v. United States*, 277 U.S. 438 (1928) (upholding the warrantless wiretapping of a target's telephone lines primarily because "[t]here was no entry of the houses or offices of the defendants"), *overruled in part by Katz v. United States*, 389 U.S. 347 (1967).[1] A

---

[1] We note that, at times, the Supreme Court has referred to this theory in the language of "trespass" rather than physical intrusion. *Compare Jones*, 132 S. Ct. at 949-50, *with Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). As the law currently stands, we think the latter term — "physical intrusion" — is the more appropriate. *See Jardines*, 133 S. Ct. at 1420-21 (Alito, J., dissenting) (criticizing the Supreme Court's most recent application of the physical intrusion theory and noting that "trespass law provides no support for the Court's holding today"); *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("[W]e need not pause to consider whether or not there was a technical trespass under the local

change came in 1967 with the decision in *Katz v. United States*, which involved the warrantless wiretapping of a public phone booth. 389 U.S. 347. In *Katz*, the Court announced that the Fourth Amendment "protects people, not places," *id.* at 351, a principle that eventually became embodied in what Justice Harlan termed an individual's "reasonable expectation of privacy" (the privacy theory), *id.* at 360-61 (Harlan, J., concurring). In subsequent years, the privacy theory became the driving force behind Fourth Amendment jurisprudence, while the physical intrusion theory lay dormant. *See, e.g.*, *United States v. Santillo*, 507 F.2d 629, 632 (3d Cir. 1975) (noting that "the trespassory concepts [in early Fourth Amendment jurisprudence] . . . have since been discredited" (footnotes omitted) (citing *Katz*, 389 U.S. at 352-53)).

## A. Beepers, GPS Devices, and the Fourth Amendment

It was in this context that courts began grappling with the constitutionality of using tracking devices. For purposes of our discussion, we begin with the Fifth Circuit's 1981 decision in *United States v. Michael*, 645 F.2d 252 (5th Cir. 1981) (en banc), which considered the warrantless use of a beeper for surveillance of a suspected drug manufacturer. In *Michael*, the court assumed that installation of the beeper on the exterior of a van constituted a search before holding that the DEA agents' conduct was constitutional since they acted based on reasonable suspicion. *Id.* at 256-59 (holding that defendant had "reduced" privacy expectations in the

property law relating to party walls. Inherent Fourth Amendment rights are not inevitably measurable in terms of ancient niceties of tort or real property law." (footnote omitted)).

11

movement of his automobile and that the use of a beeper was minimally intrusive). A pair of dissenting opinions argued that, among other things, the DEA agents were required to obtain a warrant because they physically intruded upon the defendant's property (*i.e.*, his car). *See, e.g.*, *id.* at 260-70 (Tate, J., dissenting).

Two years later, the Supreme Court took up the beeper issue, ultimately holding that concealing a beeper inside of a container that was then loaded onto a target's vehicle did not constitute a search, where the beeper's placement was accomplished with the container owner's consent. *United States v. Knotts*, 460 U.S. 276, 279-80, 285 (1983). In so doing, the Supreme Court explained that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id.* at 281. Nonetheless, the Court's ruling was not unequivocal, with the Majority cautioning that twenty-four hour, "dragnet type law enforcement practices" could implicate "different constitutional principles." *Id.* at 283-84.

The Supreme Court returned to beepers the following year when it decided *United States v. Karo*, 468 U.S. 705 (1984), which centered on the DEA's use of a beeper to collect information regarding the whereabouts of objects inside a private residence. In *Karo*, the DEA had once again secreted a beeper inside of a container — also with the container owner's consent — and ensured that the container would be loaded into the target's vehicle. *Id.* at 708-09. The agents then used the beeper to track the vehicle to various locations and determined that the beeper-concealing container had been brought inside several residences (something that they could not verify with visual surveillance). *Id.* at 709-10. In holding that use of the beeper was unconstitutional under

12

those circumstances, the Court explained that, unlike in *Knotts* — where information was "voluntarily conveyed to anyone who wanted to look" — the information obtained by monitoring the beeper while inside a private residence gave the DEA information "that could not have been visually verified." *Id.* at 715 (internal quotation marks omitted). In a partial dissent, Justice Stevens (joined by Justices Brennan and Marshall) argued that placing the beeper inside a container, which was then loaded into the target's vehicle, implicated both a "seizure and a search within the meaning of the Fourth Amendment." *Id.* at 728 (Stevens, J., dissenting in part).

After the beeper-centered decisions in *Michael*, *Knotts*, and *Karo*, technological advances heralded the advent of a new electronic surveillance device: the GPS tracker. One of the first decisions to address the constitutionality of this new technology was *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999). In *McIver*, the Ninth Circuit rejected defendant's argument that installing a GPS device (along with a beeper) on the "undercarriage of [the defendant's automobile]" constituted a "seizure of the vehicle." *Id.* at 1127 ("McIver did not present any evidence that the placement of the magnetized tracking devices deprived him of dominion and control of his [vehicle], nor did he demonstrate that the presence of these objects caused any damage to the electronic components of the vehicle."). The court also concluded that, because McIver could demonstrate no reasonable expectation of privacy in the exposed undercarriage of his car, the use of the electronic devices did not constitute a search under the Fourth Amendment. *Id.* at 1126-27.

The Seventh Circuit followed suit in 2007, with Judge Posner explaining that attaching a GPS device to a target

13

vehicle did not constitute a search because such a device merely substitutes for "following a car on a public street," an activity that "is unequivocally *not* a search within the meaning of the [Fourth Amendment]." *United States v. Garcia*, 474 F.3d 994, 997 (7th Cir. 2007). However, echoing the Supreme Court's concerns in *Knotts*, the Seventh Circuit warned that it might need to reevaluate its conclusion if faced with a case concerning use of GPS technology for mass surveillance. *Id.* at 998.

Three years later, the Ninth Circuit returned to the topic of GPS tracking, reaffirming its conclusion that attaching a GPS tracker to the undercarriage of a vehicle did not constitute a search. *United States v. Pineda-Moreno*, 591 F.3d 1212, 1214-15 (9th Cir. 2010). The appellant filed a petition for rehearing en banc, and though the Ninth Circuit denied the petition, Chief Judge Kozinski issued a fiery dissent from the denial, accusing the *Pineda-Moreno* majority of being "inclined to refuse nothing" to the needs of law enforcement. *United States v. Pineda-Moreno*, 617 F.3d 1120, 1121 (9th Cir. 2010) (Kozinski, C.J., dissenting). In his dissent, the Chief Judge noted that GPS devices "have little in common with the primitive devices in *Knotts*," in part because, unlike GPS devices, beepers "still require[] at least one officer — and usually many more — to follow the suspect." *Id.* at 1124. Thus, the dissent noted, while "[y]ou can preserve your anonymity from prying eyes, even in public, by traveling at night, through heavy traffic, in crowds, by using a circuitous route, disguising your appearance, passing in and out of buildings and being careful not to be followed," there is "no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, and never lose attention." *Id.* at 1126.

That same year, the Eighth Circuit became the third of our sister courts to say that attaching a GPS device to a target car was not a constitutional violation. *United States v. Marquez*, 605 F.3d 604, 609-10 (8th Cir. 2010). While the *Marquez* court based its ruling on standing grounds, it still announced — albeit in dicta — that "[w]hen electronic monitoring does not invade upon a legitimate expectation of privacy, no search has occurred." *Id.* at 609 ("A person traveling via automobile on public streets has no reasonable expectation of privacy in his movements from one locale to another." (citing *Knotts*, 460 U.S. at 281)).

Later that year, the D.C. Circuit split from our sisters, holding that attaching a GPS device to a defendant's vehicle constituted a search under the Fourth Amendment that required the police to obtain a warrant. *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010). In so doing, the court rejected the *Knotts*-based argument that a driver's movements are exposed to the public and therefore do not constitute information shielded by the Fourth Amendment. *Id.* at 560 ("[W]e hold the whole of a person's movements over the course of a month is not actually exposed to the public because the likelihood a stranger would observe all those movements is not just remote, it is essentially nil."). At the same time, the court in *Maynard* rejected the applicability of the automobile exception to the warrant requirement, holding that while the exception "permits the police to search a car without a warrant if they have reason to believe it contains contraband[, it] . . . does not authorize them to install a tracking device on a car without the approval of a neutral magistrate." *Id.* at 567. A year later, the Supreme Court granted certiorari, changing the name to *United States v. Jones*. 131 S. Ct. 3064 (2011).

In reviewing the *Maynard* decision (now called *Jones*), the Supreme Court held that magnetically attaching a GPS device to a suspect's automobile constituted a search for purposes of the Fourth Amendment. *Jones*, 132 S. Ct. at 949. Rather than focusing on whether the owner of the vehicle had a reasonable expectation of privacy while driving the car over public streets, the Court (with Justice Scalia writing for the majority) concluded that attaching a GPS device to a target car constituted a physical intrusion upon the vehicle owner's private property. *Id.* ("The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted.").

Justice Alito concurred in the judgment, but did not join the majority's opinion. *Id.* at 957 (Alito, J., concurring). In his opinion — joined by Justices Ginsburg, Breyer, and Kagan — the appropriate Fourth Amendment analysis was the "reasonable expectation of privacy" inquiry under *Katz*. The outcome would be no different if the Court had applied *Katz*, the concurrence argued, because "society's expectation has been that law enforcement agents and others would not — and indeed, in the main, simply could not — secretly monitor and catalogue every single movement of an individual's car for a very long period" of time. *Id.* at 964.

Justice Sotomayor, who joined the majority, also filed a concurrence. *Id.* at 954 (Sotomayor, J., concurring). And while she agreed with portions of Justice Alito's reasoning, she nonetheless rebuked the concurring Justices for potentially countermanding an "irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs." *Id.*

at 955. Moreover, Justice Sotomayor argued that GPS devices present law-enforcement agencies with a low-cost, low-resource method of tracking citizens. As such, even short-term surveillance constituted an impermissible search under the Fourth Amendment. *Id.* at 955-57 (calling, also, for potentially reassessing the privacy interests individuals enjoy in information disclosed to third parties so as to account for the new realities of the digital age).

Among the issues that *Jones* left open, however, was whether warrantless use of GPS devices would be "reasonable — and thus lawful — under the Fourth Amendment [where] officers ha[ve] reasonable suspicion, and indeed probable cause" to execute such searches. *Id.* at 954 (citation and internal quotation marks omitted). The instant case squarely presents this very issue for our consideration.[2]

---

[2] At the time of this writing, we are not aware of — nor has either party brought to our attention — any decision by one of our sister circuits that directly and definitively resolves the matter. As our brethren in the First Circuit noted earlier this year:

Few courts (and no circuits that we know of) have grappled with the warrant question so far, largely because the searches at issue in recent cases occurred pre-*Jones*, allowing the government to argue, and a number of courts to find, that the good-faith exception [to the exclusionary rule] would apply even if the searches were unconstitutional.

*United States v. Sparks*, 711 F.3d 58, 62 (1st Cir. 2013). As we explain at greater length below, we do not believe that the good-faith exception applies in this case and consequently take on the warrant issue.

We therefore turn now to a consideration of the Fourth Amendment's warrant requirement and the various — albeit circumscribed — exceptions thereto.

## B.    The Warrant Requirement and Its Exceptions

The Fourth Amendment does not protect individuals from *all* searches, just unreasonable ones. Indeed, as the Supreme Court has noted: "[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). "[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* at 652-53 (internal quotation marks omitted). Under this "general . . . approach," courts look to the "totality of the circumstances" in performing this balancing test. *United States v. Knights*, 534 U.S. 112, 118 (2001) (internal quotation marks omitted).

More often than not, courts "strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989). Thus, "[i]t remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *United States v. Harrison*, 689 F.3d 301, 306 (3d Cir. 2012) (internal quotation marks omitted). This protection applies to both "'houses' and 'effects,'" barring the presence of some "'exceptional circumstances'" that would permit an exception. *See United States v. Jeffers*, 342 U.S.

18

48, 51 (1951) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

We therefore begin with the following observation: under the physical intrusion theory of the Fourth Amendment, the police actions in this case — *i.e.*, physical entry upon and occupation of an individual's house or effects for purposes of ongoing GPS tracking — are highly disconcerting. In *Silverman v. United States*, 365 U.S. 505 (1961), the police, acting without a warrant, had surreptitiously driven a "spike mic" (a long spike capable of picking up sound) through the wall of a neighboring house and into the heating duct of the defendant's home. *Id.* at 506-07. The Court proclaimed this to be "beyond the pale of even those decisions in which a closely divided Court has held that eavesdropping accomplished by other than electronic means did not amount to an invasion of Fourth Amendment rights." *Id.* at 509-10; *id.* at 511-12 ("This Court has never held that a federal officer may *without warrant* and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard." (emphasis added)). While the Fourth Amendment recognizes a difference between the invasion of a "store, dwelling house, or other structure . . . of which a . . . warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile . . . where it is not practicable to secure a warrant," that difference, on its own, still mandates that a warrantless search of a car be based on probable cause — and, even then, only in a highly circumscribed universe of cases. *Carroll v. United States*, 267 U.S. 132, 153 (1925).[3]

---

[3] We address the "automobile exception," first recognized in *Carroll*, in greater detail below.

We thus have no hesitation in holding that the police must obtain a warrant prior to attaching a GPS device on a vehicle, thereby undertaking a search that the Supreme Court has compared to "a constable's concealing himself in the target's coach in order to track its movements." *Jones*, 132 S. Ct. at 950 n.3. In the following section, therefore, we analyze whether any additional considerations weigh in favor of finding warrantless GPS searches to be reasonable.

## 1. Valid, Warrantless Searches Based on Less than Probable Cause

The Government first argues that the warrantless use of a GPS device in this case constitutes a reasonable search because the police action was based on reasonable suspicion.[4] In service of this argument, the Government posits that "[s]ince *Terry v. Ohio*, 392 U.S. 1 (1968), the Court has identified various law enforcement actions that qualify as Fourth Amendment searches or seizures, but that may nevertheless be conducted without a warrant or probable cause." (Appellant Br. at 23.) This is true. The Government cites to three general categories of cases that permit warrantless searches based on less than probable cause: "special needs" cases, decisions addressing circumstances in which individuals have lessened privacy interests, and the progeny of *Terry v. Ohio*. We consider each category in turn and find that none apply to the instant matter.

---

[4] We assume, without deciding, that the police had reasonable suspicion for purposes of our analysis.

### a. The "Special Needs" Cases

As the Supreme Court has explained: "We have recognized exceptions to th[e Warrant Clause] when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Skinner*, 489 U.S. at 619-20 (internal quotation marks omitted) (collecting cases). Thus, so long as the "primary purpose" is not to "uncover evidence of ordinary criminal wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000), courts should "balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context," *Skinner*, 489 U.S. at 619. *See also United States v. Ward*, 131 F.3d 335, 342 (3d Cir. 1997). Such "special needs" cases, many of which permit searches without *any* particularized suspicion, constitute a "closely guarded category" of Fourth Amendment jurisprudence. *Ferguson v. City of Charleston*, 532 U.S. 67, 77 (2001) (internal quotation marks omitted).

In the instant case, the reasoning behind the "special needs" doctrine is inapposite. The Government cannot articulate a particularized interest, other than a generalized interest in law enforcement. Indeed, the Government contends that if officers are required to obtain a warrant and have probable cause prior to executing a GPS search, "officers could not use GPS devices to gather information to establish probable cause, *which is often the most productive use of such devices*." (Appellant Br. at 27 (emphasis added).) This statement — which wags the dog rather vigorously — runs headlong into *Ferguson*'s admonition that, to qualify for a "special needs" exception, the primary purpose of a search cannot be to "generate evidence for law enforcement purposes." 532 U.S. at 83 (emphasis omitted); *Edmond*, 531

21

U.S. at 48 (finding that a search did not qualify under the "special needs" doctrine where the "primary purpose of the [search] is ultimately indistinguishable from the general interest in crime control").[5]

### b. Cases of Diminished Privacy Expectations

Still, the "special needs" cases are not the only decisions to permit warrantless searches based on less than probable cause. The Government also cites a number of cases that address situations where the targets of a search enjoyed a lower expectation of privacy.[6] *See, e.g.*, *United States v.*

---

[5] The Government contends that requiring a warrant prior to GPS searches would "seriously impede the government's ability to investigate drug trafficking, terrorism, and other crimes." (Appellant Br. at 27.) We fail to see how such a conclusory assertion suffices to except GPS searches from the requirements of the Fourth Amendment's Warrant Clause. Doubtless, we are aware of the dangers posed by terrorism and comparably reprehensible criminal activity. However, we would work a great disservice by permitting the word "terrorism" (in the absence of any other information or circumstance) to act as a skeleton key to the liberties guaranteed under the Constitution.

[6] The seemingly paradoxical exercise of analyzing a search based on physical intrusion under the rubric of privacy expectations does not escape our notice. Still, as the Supreme Court noted in *Jones*: "The *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Jones*, 132 S. Ct. at 952. Moreover, we note that even before *Katz*, the Supreme Court was balancing the "need for effective law enforcement

*Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."). We do not think such reasoning is applicable to this case.

The police executed a GPS search against an individual — Harry Katzin — who, at least when the police attached the GPS device, enjoyed the full breadth of privacy interests owed to him under the Constitution. That the search was executed on a car is, likewise, unpersuasive. While the Supreme Court has acknowledged that individuals enjoy a lowered expectation of privacy in their cars, *United States v. Chadwick*, 433 U.S. 1, 12 (1977), *abrogated by California v. Acevedo*, 500 U.S. 565 (1991), absent circumstances that are not present in this case, the police must still have probable cause, *Acevedo*, 500 U.S. at 579-80.

## c.   *Terry* and Its Progeny

In no small part, the Government argues that the warrantless use of slap-on GPS devices is permissible based on reasonable suspicion under the principles of *Terry v. Ohio*, 392 U.S. 1. In *Terry*, the Supreme Court held that a police officer could "stop" an individual on the street for questioning

---

against the right of privacy" in considering whether a particular situation constituted an exception to the Fourth Amendment's warrant requirement. *Johnson*, 333 U.S. at 14-15 (considering warrantless searches based on probable cause).

and then "frisk" him to ascertain whether the individual was carrying weapons. *Terry*, 392 U.S. at 22-27. More specifically, the Court held that a warrantless search — the stop — was permissible when based on less than probable cause if the "police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* at 30. As for the search — the frisk — the Court explained that a search was permitted when the officer reasonably believed that "the person[] with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety." *Id.* Such a search, given that it is performed without probable cause, "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search." *Id.* at 26. The *Terry* framework has since expanded to include situations where, for example, an automobile has been stopped. *See, e.g.*, *Michigan v. Long*, 463 U.S. 1032 (1983); *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *United States v. Yamba*, 506 F.3d 251 (3d Cir. 2007).

We find *Terry* and its progeny to be inapposite in this situation. While the frisk in *Terry* involved a pat-down of an individual, that search was limited to a specific instance in time (and limited to ascertaining whether the individual was armed or otherwise posed a danger to officer safety). A GPS search, in contrast, is an ongoing, vastly broader endeavor.[7]

---

[7] The Government argues that "[a] *Terry* search is the paradigmatic example of a law enforcement action, absent 'special needs' . . . , in which the balancing of law

24

*Cf. Berger v. New York*, 388 U.S. 41, 59 (1967) (noting that "eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures"). Over the course of the GPS tracker's operation, the device can "generate[] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring).[8]

---

enforcement interests and privacy rights yields a standard less than probable cause." (Appellant Br. at 33.) This is incorrect. While the Court found that the "stop" was permissible despite merely serving a "legitimate investigative function," that same rationale did not apply to the "frisk." *Terry*, 392 U.S. at 22-24. Rather, the Court explicitly noted, in evaluating the search of an individual's person, that it was "now concerned with *more than the governmental interest in investigating crime*." *Id.* at 23 (emphasis added). Specifically, the *Terry* court looked to the "more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Id.* The police, in attaching a GPS device to a car, are not looking for weapons and generally are not attempting to safeguard anyone's *immediate* safety — they are attempting to investigate crime.

[8] The Government also seems to suggest that our evaluation should turn on how long the GPS unit remained attached to Harry Katzin's van. (Appellant Br. at 25.) It is unclear, however, whether such a test would prove workable. It is not apparent whether, pursuant to such a test, the government would need to know how long a GPS search would last or

Ultimately, we disagree with the Government's arguments advocating a "reasonable suspicion" standard. While the interests the police wished to further in this case are certainly important, the same interests arise in *every* investigation where the police have a potential suspect. We are hard pressed to say, therefore, that the police can — without warrant or probable cause — embark on a lengthy program of remote electronic surveillance that requires almost no law enforcement resources and physically intrudes upon an ordinary citizen's private property. Consequently, we hold that — absent some highly specific circumstances not present in this case — the police cannot justify a warrantless GPS search with reasonable suspicion alone.[9]

whether they could, upon reaching some threshold duration, request a warrant from the courts for further GPS surveillance. We need not definitively resolve this question now, however. In this case, it was only by dint of coincidence that the GPS surveillance lasted for a mere handful of days.

[9] In support of its position, the Government points to the Eighth Circuit's decision in *Marquez* and the Fifth Circuit's decision in *Michael*. In *Marquez*, the court suggested that "[w]hen electronic monitoring does not invade upon a legitimate expectation of privacy, no search has occurred." 605 F.3d at 610 ("[W]hen police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time."). In *Michael*, the Fifth Circuit explained that the "reduced" expectation of privacy with respect to the movement of an automobile and the

26

nonintrusive nature of the procedure permitted DEA agents to install a beeper on the defendant's car. 645 F.2d at 257-58 ("The actual installation of the beeper was much less intrusive than the typical stop and frisk. Michael . . . was not detained or questioned; he suffered no indignity; nothing from the interior of the van was seized or searched; indeed, nothing even from the van's exterior was removed." (footnote omitted)).

The Government's reliance is misplaced. Both *Michael* and *Marquez* were decided prior to *Jones*, and thus did not have the benefit of: (a) the Court's reliance on the pre-*Katz* trespass theory of the Fourth Amendment or (b) Justice Sotomayor's concurrence. Moreover, both cases are inapposite: In *Marquez*, the court found that the defendant lacked standing to challenge the use of the GPS device and therefore never reached the question of whether such use constituted an unreasonable search. 605 F.3d at 609. The Eighth Circuit's discussion of reasonable suspicion is therefore dicta, coming only while the court was musing on what would happen "[e]ven if [the defendant] had standing." *Id.* In *Michael*, the Fifth Circuit focused on a beeper — which is markedly different from a GPS device — and its decision is therefore distinguishable. 645 F.2d 256-59. Additionally, both decisions run up against the holding in *Maynard*, where the D.C. Circuit explained that warrantless installation of a GPS device by the police was *per se* unreasonable under the Fourth Amendment. 615 F.3d at 566-67.

## 2. Valid, Warrantless Searches Based on Probable Cause

As an alternative, the Government suggests that warrantless GPS searches can be constitutional if the police have probable cause, pointing principally to a line of cases addressing the "automobile exception" to the warrant requirement.[10] We do not agree.[11]

---

[10] We note that a warrantless search based on probable cause is also reasonable in the presence of certain "exigent circumstances" that "make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (internal quotation marks omitted). Such exigent circumstances include, but are not limited to, "hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) ("In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." (footnote omitted)). In this case, we perceive (and the Government points to) no exigency that would have justified the police in immediately searching Harry Katzin's van. We do not discount, therefore, the possibility that under highly specific circumstances — such as where life is on the line, say — the police can justify undertaking a warrantless GPS search based on probable cause.

[11] Here we also assume, without deciding, that the police had probable cause for purposes of our analysis.

Generally speaking, a warrantless search is not rendered reasonable merely because probable cause existed that would have justified the issuance of a warrant. *See Vale v. Louisiana*, 399 U.S. 30, 34 (1970); *see also Johnson*, 333 U.S. at 14 ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers."). However, under the "automobile exception," we permit "warrantless searches of any part of a vehicle that may conceal evidence . . . where there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. McGlory*, 968 F.2d 309, 343 (3d Cir. 1992) (internal quotation marks omitted); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search . . . , it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (holding that warrantless searches of an automobile are permitted if "probable cause exists to believe it contains contraband" (internal quotation marks omitted)). That said, the Supreme Court has recognized that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461-62 (1971) (discussing the automobile exception in the context of exigent circumstances).[12] Indeed, the automobile exception does not

---

[12] The automobile exception began as part of the "exigent circumstances" jurisprudence. *Carroll*, 267 U.S. at 153 (noting that the Fourth Amendment made a distinction for searches of automobiles since "it is not practicable to secure a

29

validate all warrantless automobile searches, but instead is "unquestionably [a] specifically established and well delineated" exception. *Ross*, 456 U.S. at 824 (internal quotation marks omitted). Thus, "'[t]he scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" *Acevedo*, 500 U.S. at 579-80 (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)).

We hold that the automobile exception is inapplicable here. The key distinction in this case is the type of search at issue. While the Supreme Court has stated that the automobile exception permits a search that is "no broader and no narrower than a magistrate could legitimately authorize by warrant," *Ross*, 456 U.S. at 825, the search is still limited to a

warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought"). Later cases expanded on this rationale, adding further justification for why the police need not obtain a search warrant for the car. Most significantly, after the *Katz* decision had given precedential imprimatur to the language of "privacy," the Court explained in *United States v. Chadwick*, that "'[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.'" 433 U.S. at 12 (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974)). Finally, the Supreme Court severed the connection between the automobile exception and exigent circumstances, holding that the exception "has no separate exigency requirement" at all. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).

discreet moment in time. For example, the exception permits the police to enter upon and search a vehicle to ascertain whether it indeed contains the evidence that they suspect is inside. Thus, assuming — as we said we would — that the police had probable cause to believe that Harry Katzin's van contained some form of contraband, they would have been justified in entering "*any part* of [the] vehicle that may conceal evidence." *McGlory*, 968 F.2d 343 (emphasis added). Attaching and monitoring a GPS tracker is different: It creates a continuous police presence for the purpose of discovering evidence that may come into existence and/or be placed within the vehicle at some point in the future.

It is no argument, then, to say that a GPS search presents the type of circumstances that usually trigger the automobile exception. It does not. While the police are still physically intruding into a target vehicle for evidence-gathering purposes, a GPS search extends the police intrusion well past the time it would normally take officers to enter a target vehicle and locate, extract, or examine the then-existing evidence.[13] For similar reasons, the case in favor of applying the automobile exception fares no better if we look to the

---

[13] We recognize that the Supreme Court has sanctioned warrantless searches under the automobile exception that, for example, have occurred some time after the police first impounded a vehicle. *See, e.g.*, *United States v. Johns*, 469 U.S. 478, 485-88 (1985). We think this to be of no moment for our purposes. In cases such as *Johns* the search at issue still occurs at a specific point in time and is specifically limited in its scope to "places in which there is probable cause to believe that [contraband] may be found." *Id.* at 485-86 (internal quotation marks omitted).

"ready mobility" of the target vehicle. *Burton*, 288 F.3d at 100 ("[T]he 'ready mobility' of automobiles permits their search based only on probable cause."); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (noting that "the automobile does not have a separate exigency requirement," partly because vehicles are "readily mobile"). Simply put: attaching and monitoring a GPS tracker does not serve the purposes animating the automobile exception. As has already been said: the automobile exception permits the police to intrude into a vehicle to retrieve or examine then-existing evidence. A GPS search does not deal with existing evidence, but with *future* evidence that the police suspect could come into being. That is a worthy goal, to be sure, but it cannot absolve law enforcement personnel of the warrant requirement. As the Government points out, the Supreme Court's automobile exception decisions are "'based on the practicalities of the situations presented.'" (Appellant Br. at 40 (quoting *Ross*, 456 U.S. at 807 n.9).) However, the Government seems to overlook that the power to create an ongoing, near-invisible police presence via a GPS tracker skews the "realistic appraisal of the . . . protection that a contrary rule would provide" from the "relatively minor" to the decidedly major. (*Id.* (discussing protection for "privacy interests").)

Additionally, we think that the "pervasive regulation of vehicles capable of traveling on the public roadways" is of no moment for purposes of the instant case. *California v. Carney*, 471 U.S. 386, 392 (1985). True, such pervasive regulation gave rise to the understanding that an individual is "accorded less privacy in [his] automobile[]." *Id.* Indeed, this principle animated the Supreme Court's statement that "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its

use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391. Nevertheless, we still hold that a GPS search is sufficiently different from the type of search sanctioned by the automobile exception jurisprudence — and that, as a consequence, even the extensive scheme of regulation now affecting motorists does not permit the government to dispense with asking for permission from a neutral magistrate when seeking to physically intrude upon a target vehicle for longer than is necessary to locate, remove, and/or verify the presence of already-existing evidence of criminal wrongdoing. *Cf. Delaware v. Prouse*, 440 U.S. 648, 662-63 (1979) (noting, in the context of *Terry* stops, that "[w]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed").[14]

---

[14] The Government also points to *New York v. Class*, 475 U.S. 106 (1986), for the proposition that a warrantless, minimally intrusive search of a vehicle is permitted where the police have probable cause. (Appellant Br. at 37). In *Class*, the police had stopped a car for various traffic violations. After the driver exited the vehicle of his own accord, an officer approached the vehicle in order to copy the VIN number on the dashboard. Finding his view obscured, the officer reached into the car to move some papers and, in the process, observed the handle of a gun. Inevitable results followed. *Class*, 475 U.S. at 107-09. A brief look at the underlying reasoning of *Class*, however, demonstrates that it is inapposite: the Court reasoned that the brief search served several important government needs beyond a basic interest in law enforcement, including "the governmental interest in

33

Ultimately, in executing a GPS search, the police were not attempting to recover or ascertain the presence of evidence already present in Harry Katzin's vehicle. If they were, the automobile exception would have sanctioned their search in so far as it allowed them to enter Harry Katzin's van and retrieve and/or verify the presence or absence of the sought-after evidence. It would not (and, indeed, did not) permit them to leave behind an ever-watchful electronic sentinel in order to collect future evidence. Were we to hold otherwise, we would unduly expand the scope of the automobile exception well past its "specifically established and well delineated" contours, *Ross*, 456 U.S. at 824, permitting the police to intrude indefinitely upon a target vehicle based solely on the prospect that it will, in the future, contain some contraband or be used during the commission of a crime.

For these reasons we hold that the warrantless search in this case was not justifiable based solely on reasonable suspicion or probable cause, was thereby unreasonable, and consequently violated the Fourth Amendment.

## IV. The Exclusionary Rule & the Good Faith Exception

Having held that the police were required to obtain a warrant prior to executing their GPS search of Harry Katzin's van, we now consider whether the evidence uncovered as a

---

highway safety" and a "concern for the officers' safety." *Id.* at 118. Here, neither of the interests is directly served. *Accord Jones*, 132 S. Ct. at 952 (holding that *Class* is inapplicable to GPS searches because "attaching [a] device to the [car]" may have resulted in a different outcome).

34

result of their unconstitutional actions should be suppressed. We hold that it should.

## A.    Exclusionary Rule Jurisprudence

While the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[, it] says nothing about suppressing evidence obtained in violation of this command." *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (internal quotation marks omitted). Nevertheless, to "compel respect for the constitutional guaranty," the Supreme Court created the exclusionary rule. *Elkins v. United States*, 364 U.S. 206, 217 (1960). The rule mandates that evidence obtained in violation of the Fourth Amendment should not be available at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). However, "that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Id.* at 140.

As the Supreme Court has made plain, "exclusion has always been our last resort, not our first impulse." *Id.* (internal quotation marks omitted). To that end, the Supreme Court has recognized the existence of a "good faith" exception to the exclusionary rule in cases where the police "act[ed] with an objectively reasonable good-faith belief that their conduct [was] lawful." *Davis*, 131 S. Ct. at 2427 (internal quotation marks omitted).[15] More specifically, the

---

[15] As the Supreme Court noted in *Herring*, "good faith exception" is somewhat of a misnomer. 555 U.S. at 142. The inquiry is not subjective at all, but instead looks to an officer's "objectively reasonable reliance." *Id.* Nonetheless,

Supreme Court has held this exception to cover situations where law enforcement personnel have acted in objectively reasonable reliance on some seemingly immutable authority or information that justifies their course of action. *See Davis*, 131 S. Ct. 2419 (later-reversed binding appellate precedent); *Herring*, 555 U.S. 135 (undiscovered error in police-maintained database); *Arizona v. Evans*, 514 U.S. 1 (1995) (undiscovered error in court-maintained database); *Illinois v. Krull*, 480 U.S. 340 (1987) (subsequently overturned statute); *United States v. Leon*, 468 U.S. 897 (1984) (later-invalidated warrant).

To determine whether a particular situation is covered under this good faith exception, the Supreme Court has directed courts to consider whether exclusion would serve "to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426; *see also Leon*, 468 U.S. at 918 ("If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, . . . it must alter the behavior of individual law enforcement officers or the policies of their departments."). Thus, in analyzing whether the good faith exception applies, the Court balances "the benefits of the rule's deterrent effects against the costs of exclusion, which include 'letting guilty and possibly dangerous defendants go free.'" *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010) (quoting *Herring*, 555 U.S. at 141).

When considering the benefits gained from deterrence, we must necessarily consider the nature and culpability of the

because the Supreme Court (and our own decisions) use the terms interchangeably, we do so as well.

36

police conduct at issue. As the Supreme Court has explained, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144; *Davis*, 131 S. Ct. at 2429 (cautioning courts not to discourage "the officer from doing his duty" (alteration and internal quotation marks omitted)). Thus, "we apply the rule when police conduct is 'deliberate, reckless, or grossly negligent,' or when it will deter 'recurring or systemic negligence.'" *Tracey*, 597 F.3d at 151 (quoting *Herring*, 555 U.S. at 144). On the other hand, isolated or attenuated acts of negligence do not warrant the rule's application. *Id.*

In light of these principles, the Government argues that the police conduct at issue in this case does not rise to the level of culpability necessary for the exclusionary rule to apply and that, as a consequence, the balancing test outlined in *Herring* and *Davis* militates in favor of applying the good faith exception. In service of its argument, the Government urges that the police acted with an objectively reasonable good faith belief that their conduct was constitutional because "[b]efore *Jones*, every court of appeals to consider the question[, with the exception of one,] had concluded that, in light of the Supreme Court's decision in [*Knotts*], police did not need to obtain a warrant to install a GPS tracking device on the exterior of a vehicle or to use that device to monitor the vehicle's movements on public roads." (Appellant Br. at 48-49.) Indeed, the Government posits that this "consensus" among our sister circuits, coupled with the "guidance in *Knotts* and *Katz*," absolves law enforcement personnel for purposes of the exclusionary rule. (*Id.* at 50, 55 n.21; Oral Argument Tr. at 23.) We find the Government's position

unpersuasive and therefore hold that the good faith exception does not apply here.

## B.    Reliance on Beeper Cases

The Government posits that law enforcement personnel acted in good faith because they relied on, among other things, the Supreme Court's "guidance" from *Knotts* that using an electronic tracking device does not violate the Fourth Amendment.  (Appellant Br. at 55 n.21.)  Indeed, the Government observes that the reasoning from *Knotts* underpins the decision of "every court of appeals to consider" GPS tracking (save the D.C. Circuit).  (*Id.* at 48-49.)  We first ask ourselves, therefore, whether the *Knotts* decision — along with its sibling case, *Karo* — qualifies as binding precedent under *Davis v. United States*, wherein the Supreme Court held that the good faith exception covers police officers acting in reliance on later-invalidated binding appellate precedent.  131 S. Ct. 2419.  As the forthcoming discussion demonstrates, we find that the explicit holding from *Davis* is inapposite because *Knotts* and *Karo* are both distinguishable given (1) the lack of a physical intrusion in those cases, (2) the placement by police of the beepers inside containers, and (3) the marked technological differences between beepers and GPS trackers.

In *Davis*, the police had executed a search of the defendant's car subsequent to his arrest.  At the time of the search, prevailing Supreme Court and Eleventh Circuit precedent held that the police could lawfully search a suspect's car incident to his arrest.  *See New York v. Belton*, 453 U.S. 454 (1981); *United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996).  The defendant unsuccessfully challenged the search.  While the defendant's appeal was pending, the Supreme Court limited *Belton*, effectively restricting the areas

of the car that the police were allowed to search after a suspect's arrest. *See Arizona v. Gant*, 556 U.S. 332 (2009). In deciding *Davis*, the Supreme Court reasoned that "[r]esponsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules." 131 S. Ct. at 2429 (internal quotation marks omitted). According to the Court, the police in *Davis* merely behaved as "reasonable officer[s] would and should act." *Id.* (internal quotation marks omitted). Consequently, the Court found that "[t]he deterrent effect of exclusion in such a case can only be to discourage the officer from do[ing] his duty," which was not "the kind of deterrence the exclusionary rule seeks to foster." *Id.* (internal quotation marks omitted). Ultimately, therefore, the Court deemed that the police in *Davis* were covered by the good faith exception to the exclusionary rule and evidence recovered pursuant to the search was not suppressed. *Id.*

Of great significance to the instant case is the fact that in *Davis* the police relied on binding appellate precedent that "*specifically authorize*[*d* the] particular police practice." *Id.* at 2429 (first emphasis added). Indeed, as Justice Sotomayor noted in her concurrence, *Davis* did not "present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 2435 (Sotomayor, J., concurring).[16] By

---

[16] We also note that the Eleventh Circuit's opinion in *Davis* was explicit on this point: "[We refuse] to apply the exclusionary rule when the police have reasonably relied on *clear and well-settled* precedent. We stress, however, that our precedent on a given point must be *unequivocal* before we will suspend the exclusionary rule's operation." *United*

39

its plain terms, therefore, the express holding in *Davis* is inapposite to this case because *Knotts* and *Karo* do not qualify as appropriate binding appellate precedent: Neither case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver (all with the container owner's permission). *See Karo*, 468 U.S. at 708; *Knotts*, 460 U.S. at 278. Additionally, both *Karo* and *Knotts* addressed the use of beepers, which — as we have already explained — are markedly different from GPS trackers. *See Maynard*, 615 F.3d at 556-57.

*Davis* extends good faith protection only to acts that are explicitly sanctioned by clear and well-settled precedent, and neither *Knotts* nor *Karo* sanction the type of intrusion at issue in this case. Consequently, we hold that law enforcement's reliance on the beeper cases, standing on its own, cannot sufficiently insulates the GPS search in this case from the exclusionary rule.

---

*States v. Davis*, 598 F.3d 1259, 1266 (11th Cir. 2010) (citations omitted) (emphasis added); *see also United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) ("Like the Eleventh Circuit, we also 'stress, however, that our precedent on a given point must be unequivocal before we will suspend the exclusionary rule's operation.'" (quoting *Davis*, 598 F.3d at 1266)); *United States v. McCane*, 573 F.3d 1037, 1045 n.6 (10th Cir. 2009) (finding that the good faith exception applied because "Tenth Circuit jurisprudence supporting the search was settled. Thus, there was no risk that law enforcement officers would engage in the type of complex legal research and analysis better left to the judiciary and members of the bar").

## C.  Reliance on Out-of-Circuit GPS Cases

We therefore consider the Government's contention that the good faith exception applies because the police acted in objectively reasonable reliance on out-of-circuit precedent sanctioning warrantless GPS surveillance.  (Appellant Br. at 15-16 ("Before [*Jones*], all but one of the courts of appeals to have addressed the issue had approved the warrantless installation and monitoring of a GPS device on a vehicle. . . . [T]he agents' reliance on this body of case law was objectively reasonable . . . .").)  And while the Government relies, in no small part, on the reasoning in *Davis* for support, we think that reading *Davis* so broadly would strain its reasoning, to say nothing of its holding.[17]

---

[17] We note that the majority in *Davis* itself suggested that its holding is inapplicable to the situation presented in this case. While explaining that its ruling will not deter defendants from challenging existing Fourth Amendment doctrine, the Supreme Court noted:

This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals.  If one or even many of these courts uphold a particular type of search or seizure, defendants in *jurisdictions in which the question remains open* will still have an undiminished incentive to litigate the issue.  This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted.

The *Davis* decision hinged on the understanding that "[r]esponsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules." *Id.* (internal quotation marks omitted). At the most basic level, then, the applicable body of "Fourth Amendment precedent" to which the responsible officer must conform consists of those decisions that are binding on the officer's jurisdiction. *Accord Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (noting that officers are expected to learn and abide by "what is required of them" by courts having jurisdiction over them).

Thus, as already stated, the Court in *Davis* recognized that the good faith exception applies to situations where the police "conducted a search in objectively reasonable reliance on binding appellate precedent," 131 S. Ct. at 2434, because "[t]he deterrent effect . . . in such a case can only be to discourage the officer from do[ing] his duty," which was not "the kind of deterrence the exclusionary rule seeks to foster," *id.* at 2429 (internal quotation marks omitted). The same cannot be said where the law is unsettled in a particular jurisdiction, even where persuasive authority may exist in the form of decisions by other circuit courts.

Indeed, extending the rationale from *Davis* to cover reliance on out-of-circuit precedent would turn this principle on its head: Though our first and last word on the matter is that warrantless GPS searches are unconstitutional, in effect the Government argues that our sister circuits' decisions

---

*Davis*, 131 S. Ct. at 2433 (emphasis added) (footnote omitted). Thus, the Court in *Davis* recognized that its holding was limited to jurisdictions where the law was clearly settled.

should control whether the evidence is excluded. This rule would eviscerate the notion that clear and well-settled precedent should control and thus contradicts the basic principles of stare decisis. We respect our sister circuits, but their decisions cannot dictate our conclusions. As such, any law enforcement officer who acts primarily in reliance on the Fourth Amendment proclamations of our sister circuits does so at his own peril for purposes of the exclusionary rule.

This is particularly true where, as in this case, our sister circuits are split on the relevant issue. The GPS search of Harry Katzin's van occurred in late 2010. By that time, four of our sister circuits — the Seventh, Eighth, Ninth, and D.C. Circuits — had addressed GPS surveillance. Of those, three circuits had held that GPS surveillance either did not constitute a search or, even if it did, that the police did not require a warrant. *See McIver*, 186 F.3d 1119; *Garcia*, 474 F.3d 994; *Pineda-Moreno*, 591 F.3d 1212; *Marquez*, 605 F.3d 604.

At the same time, the D.C. Circuit had held in *United States v. Maynard* (which became *Jones* on appeal to the Supreme Court) that GPS surveillance *did* constitute a search and that the police *did* require a warrant. *Maynard*, 615 F.3d 544. At bottom, then, the Government seems to argue that reliance on a majority of a minority of our sister circuits is sufficient to escape the exclusionary rule. This cannot be. Although we find it commendable that law enforcement personnel would take the time to pore over out-of-circuit decisions relating to police procedures, it is not their duty for purposes of the exclusionary rule to parse and weigh the decisions of our sister circuits in an attempt to predict what

43

this Court (or even the Supreme Court) would say if faced with a similar case.[18]

---

[18] The Government urges that our analysis in *United States v. Duka*, 671 F.3d 329, 347 (3d Cir. 2011) (addressing evidence obtained in a search pursuant to the Foreign Intelligent Surveillance Act (FISA)), supports the proposition that the reasoning from *Davis* is not limited to binding precedent. (Appellant Br. at 61-62 ("[The] insistence on binding authority does not accord with this Court's approach following *Davis*. . . . [*Duka*] undermines the district court's position that reliance on non-binding case law . . . is per se unreasonable.").)  This is not correct.  Not only was the good faith discussion in *Duka* based on a different Supreme Court decision — *Krull*, which addressed objectively reasonable reliance on a later-invalidated statute — but the entire discussion of the good faith exception is dicta. *See Duka*, 671 F.3d at 346 (discussing the "good faith" exception only after noting that "[w]e are confident that FISA's 'significant purpose' test satisfies the Fourth Amendment").  Moreover, the Government's argument seems to hinge on a footnote that contains the opinion's lone citation to *Davis*.  In that footnote, this Court stated that "[t]he objective reasonableness of the officers' reliance on the statute in this case is further bolstered by the fact that the particular provision at issue has been reviewed and declared constitutional by several courts, going as far back as 2002." *Id.* at 347 n.12 (collecting cases).  Since none of these "several courts" are the Third Circuit, the Government argues, *Duka* demonstrates our willingness to apply the rationale from *Davis* to non-binding authority.  We think this makes a mountain out of a molehill: this single

44

Moreover, we cannot burden district courts with the type of case-by-case assessment that the Government's position would require. Unlike the archetypal situations in *Leon* or *Davis*, finding that the good faith exception applies in this case would, of necessity, require courts ruling on suppression motions to discern what amounts to sufficient out-of-circuit authority for purposes of an objectively reasonable good faith belief. Thus, district courts would need to consider how many circuits had addressed the police practice in question, what each one had said, whether the statements were mere dicta, and myriad other factors. Such an approach has no limiting principle and defies rational application. Surely police reliance on a single out-of-circuit decision could not support good faith, but what about two? If the circuits split two-to-one, that would present yet another problem. And what if our sister courts had all ruled in near-unanimity on a point, with one stalwart (perhaps, highly persuasive) holdout? Is the presence of good faith to be decided with an abacus or does the strength of each court's argument bear consideration? Because we foresee that it could lead to a sprawling, amorphous, and self-contradicting doctrine, we decline to adopt the Government's position and hold that reliance on out-of-circuit precedent (even where there is a so-called "consensus") cannot, in and of itself, support application of the good faith exception.[19]

---

reference to *Davis* comes in dicta, in a footnote, as part of a "cf." citation.

[19] To see just how unwieldy the analysis could be, we need look no further than the Government's own arguments in this case. At oral argument, the Government attempted to minimize the significance of *Maynard*, suggesting that this

**D. Exclusion based on Culpability and Deterrence**

Up to this point we have considered only whether reliance by law enforcement personnel on out-of-circuit or distinguishable authority, by itself, suffices for purposes of the good faith exception. Per the previous discussion, we hold that such reliance is insufficient to support a per se finding of good faith.[20] The Supreme Court in *Herring* and

single decision had come too late in the process and was, ultimately, distinguishable. Such arguments would be disastrously disruptive to lower courts if we were to hold that reliance on out-of-circuit authority could, by itself, suffice for purposes of the good faith exception. How up-to-date must law enforcement be regarding the state of relevant legal principles? What if a decision were issued but either (a) was late in being added to a reporter/electronic database or (b) did not get sufficiently wide-spread exposure to bring it to the attention of police departments half-way across the country? Not only would district courts be forced to tally the authorities on either side of an issue like so many chit marks, but they would also have to decide whether decisions had come too late, or were perhaps too obscure.

[20] We note that some of our sister circuits have ruled otherwise, holding that, per *Davis*, pre-*Jones* warrantless GPS searches qualify for protection under the good faith exception. *See United States v. Sparks*, 711 F.3d 58 (1st Cir. 2013); *United States v. Andres*, 703 F.3d 828 (5th Cir. 2013); *United States v. Pineda-Moreno*, 688 F.3d 1087 (9th Cir. 2012). These cases, however, do not deter us from our conclusion.

To begin with, all three courts relied on binding precedent within their own circuits. The Ninth Circuit noted that the

police could rely on, among other things, *McIver* for the proposition that "placing an electronic tracking device on the undercarriage of a car was neither a search nor a seizure under the Fourth Amendment." *Pineda-Moreno*, 688 F.3d at 1090. The Fifth Circuit, which devoted a single paragraph to the discussion, based its conclusion on the presence of *Michael*, and its holding that "'reasonable suspicion is adequate to support warrantless beeper installation' on a suspect's vehicle parked in a public space." *Andres*, 703 F.3d at 835 (quoting *Michael*, 645 F.2d at 257). Finally, the First Circuit based its decision to apply the good faith exception on the presence of "clear and apposite" authority, including a First Circuit decision that found "'the lessened expectancy of privacy associated with motor vehicles justifies the use of beepers without a warrant to track vehicles . . . only if the officers have probable cause at the time.'" *Sparks*, 711 F.3d at 65 (quoting *United States v. Moore*, 562 F.2d 106, 112-13 (1st Cir. 1977)). At the same time, however, the First Circuit was far from certain that out-of-circuit precedent could support a finding of good faith, noting that "the two appellate courts to consider the question since *Davis* have read *Davis* to require reliance on the case law of the jurisdiction." *Id.* at 63-64 & 63 n.2 (internal quotation marks omitted).

Moreover, both the First and Fifth Circuits based their good faith exception determinations on cases dealing with beepers, with the First Circuit in *Sparks* going so far as to hold that *Knotts* was sufficiently "clear and apposite" so as to support a finding of good faith. *Sparks*, 711 F.3d at 65. As our foregoing discussion suggests: we disagree with this position. The difference between beepers and GPS trackers is one of kind, not degree. Any time technology shifts in this way,

47

*Davis*, however, recognized that the good faith exception inquiry requires more. That is, in determining whether law enforcement personnel acted "with an objectively 'reasonable good-faith belief' that their conduct [was] lawful," we must consider whether the totality of circumstances is greater than the sum of its attendant parts. *See Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909). We therefore undertake the balancing test outlined in *Herring* and *Davis*, and ask whether — in light of all the circumstances — the police activity in this case rises to the level of a "deliberate, reckless, or grossly negligent" violation of the Fourth Amendment. *See Herring*, 555 U.S. at 144; *Tracey*, 597 F.3d at 151. We hold that it does.

Per the Government's argument, the legal landscape in this case predominantly consisted of the out-of-circuit GPS cases, the Supreme Court's beeper decisions, and the overarching privacy expectation framework for Fourth Amendment analysis adopted in *Katz* and deemed to be the sole rubric for analysis until *Jones*.[21] (*See, e.g.*, Appellant Br.

courts should expect that law enforcement will tread lightly and will refrain from reasoning by (potentially ill-fitting) analogy. *Cf. Kyllo v. United States*, 533 U.S. 27, 35-36 (2001) (discussing the Court's reticence to "leave the homeowner at the mercy of advancing technology").

[21] Our dissenting colleague points to a number of other decisions and Fourth Amendment doctrines which add further sauce to the Government's good faith goose. (*See* Dissent at 20-29 (discussing, for example, privacy considerations in the exterior of an automobile).) While we do not disagree that these too were part of the relevant legal landscape at the time the police executed their search, we nevertheless hold that —

at 44, 50, 55 n.21; Oral Argument Tr. at 23.)  Taken together, the Government contends, these sources of legal authority would lead a reasonable law enforcement officer to conclude that he was acting within the confines of the constitution when attaching a GPS tracker to the undercarriage of Harry Katzin's van.  We find that, on balance, this collection of authority does not warrant applying the good faith exception.  Try as we might to allay our concerns, we remain supremely discomfited by the lack of binding appellate guidance underlying the police action at issue in this case.  Therefore, we hold that the police acted with sufficient constitutional culpability to require exclusion and, more importantly, that suppression in this case would help deter future Fourth Amendment violations.

Law enforcement personnel can rightly rely on a number of sources for Fourth Amendment guidance — including on-point decisions by the Supreme Court and this Circuit, warrants, and statutes.  We, both as a Court and as a society, expect that law enforcement officers will consult

in light of our forthcoming discussion — such authority gets further and further afield of the relevant police conduct and could only supply marginal support to justify the police action.

The only possible exception is the advisory commentary on Federal Rule of Criminal Procedure 41. (Dissent at 32.)  However, for the reasons articulated below, *see infra* note 24, we find that this commentary would not help the Government's position — even assuming the Government had seen fit to cite (let alone mention) the language in its briefs or at oral argument.

49

these sources — it is a part of how we expect reasonable officers to act. *Davis*, 131 S. Ct. at 2429. Deterring such activity, therefore, would not serve the purposes of the exclusionary rule. *Id.* This case, as we have just mentioned, is different. Nothing in a law enforcement officer's duties forces him to either rely on non-binding precedent or to conduct the Fourth Amendment calculus himself by extrapolating from, or analogizing to, existing case law. Where an officer decides to take the Fourth Amendment inquiry into his own hands, rather than to seek a warrant from a neutral magistrate — particularly where the law is as far from settled as it was in this case — he acts in a constitutionally reckless fashion.

Here, law enforcement personnel made a deliberate decision to forego securing a warrant before attaching a GPS device directly to a target vehicle in the absence of binding Fourth Amendment precedent authorizing such a practice. Indeed, the police embarked on a long-term surveillance project using technology that allowed them to monitor a target vehicle's movements using only a laptop, all before either this Circuit or the Supreme Court had spoken on the constitutional propriety of such an endeavor. (That the surveillance lasted only a few days is mere coincidence.[22])

---

[22] We therefore reject the Government's attempts to distinguish *Maynard*. While it is true that the surveillance in *Maynard* lasted for nearly a month as compared to the several days in this case, it remains equally true that when the police attached their GPS device to Harry Katzin's van, they had no way of knowing when the next Rite Aid robbery would take place. We likewise disagree with our Dissenting colleague's assessment of *Maynard*. (Dissent at 29-31.) The good faith

50

True, the police did not act in a total vacuum, but their chosen course of action when presented with such a novel constitutional situation is nonetheless troubling:  In lieu of a binding proclamation from either this Circuit or the Supreme Court — and instead of seeking approval from a neutral magistrate — law enforcement personnel looked to other (non-binding or distinguishable) authorities like our sister circuits' decisions.  Essentially, they extrapolated their own constitutional rule and applied it to this case.  We fail to see how this absolves their behavior.  The assumption by law enforcement personnel that their own self-derived rule sanctioned their conduct — to say nothing of their unstated belief that this Circuit would automatically side with a majority of the minority of our sister circuits — was constitutionally culpable.[23]

_____

exception analysis cannot be post-hoc, and the police action at issue must be analyzed under the circumstances as they existed at the time the action was taken — in this case, before the police knew when their GPS surveillance would end.

[23] The Government suggests that the good faith exception should apply because the police sought confirmation from "experienced government attorneys."  (Appellant Br. at 56.)  The Government cites *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012), for the proposition that it shows good faith on the part of an officer if he obtains "approval of the warrant application from a superior and a prosecutor before submitting it to a magistrate."  (Appellant Br. at 57.)  However, *Messerschmidt* is inapposite.  That case considered good faith in the context of an officer relying on a warrant that had been based on an allegedly paltry affidavit.  Thus, the opinion of a third party tended to demonstrate that the officer

The decisions in *Knotts* and *Katz* do not remedy the situation. The Government suggests that in this case law enforcement personnel properly reasoned that the GPS search did not require a warrant by analogizing to *Knotts'* discussion of electronic tracking devices. Doing so, the Government adds, was imminently reasonable given the prevailing Fourth Amendment framework at the time — the privacy theory from *Katz*. That is, the Government contends that because law enforcement personnel were aware that a search occurs when the police intrude upon a target's reasonable expectation of privacy, they acted in good faith by relying on our sister circuits' GPS decisions as well as *Knotts'* statement that, among other things, "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. We find such reasoning

had not acted with knowledge of the affidavit's deficiency. In the instant case, the police lack even an affidavit. Moreover, a government attorney's approval, standing alone, cannot and should not suffice to demonstrate good faith. *Cf. Leon*, 468 U.S. at 914 ("[T]he courts must also insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police. . . . [A magistrate] who acts instead as an adjunct law enforcement officer cannot provide valid authorization for an otherwise unconstitutional search." (internal quotation marks omitted)). Thus, while we agree that it is another "factor to consider," (Oral Argument Tr. at 51-52; Dissent at 33), we nonetheless hold that, in this case, seeking the advice of a "government attorney[]" does not offer much support to the Government's position.

dangerous for the reasons already articulated above: Law enforcement can always derive some constitutional principle from existing decisions — which is particularly true when they also look directly to a generalized baseline case like *Katz*. It cannot be that the good faith exception applies in every instance when the police act in reliance on such a self-derived principle. If it did, then all Fourth Amendment protections would be rendered ineffective — the police could intrude upon anyone's Fourth Amendment rights without fear of suppression merely by relying on a particularly broad-sweeping, self-derived constitutional principle. We fear that accepting the Government's position, in effect, would lead to the good faith exception swallowing the exclusionary rule.[24]

---

[24] The Dissent argues that Federal Rule of Criminal Procedure 41 — particularly the 2006 advisory committee notes to that rule — further supports a finding that the law enforcement officers in this case acted with an objectively good faith belief that their conduct was constitutional. (Dissent at 32.) In particular, the Dissent points to the following language from the 2006 advisory committee notes: "If . . . the officers intend to install and use [a tracking device] without implicating any Fourth Amendment rights, there is no need to obtain a warrant." Fed. R. Crim. P. 41(b) advisory committee's note (2006) (citing *Knotts*, 460 U.S. 276). This language, however, stands for nothing more than the unremarkable proposition that the police need not obtain a warrant if their action does not violate the Fourth Amendment. Without our (or the Supreme Court's) having ruled on the matter, however, the police could not reasonably say that the use of a GPS tracker would not "implicat[e] . . . Fourth Amendment rights." Indeed, even under the most generous rationale, this

Moreover, since such constitutionally reckless action was the Government's *default* choice in this case, we hold that applying the exclusionary rule aptly serves its intended purpose: to "deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426; *see also id.* at 2435 (Sotomayor, J., concurring) ("[W]hen police decide to conduct a search or seizure in the absence of case law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations . . . ."). The police practice at issue here effectively disregarded the possibility that we could find a GPS search to constitute a Fourth Amendment violation requiring a warrant. But a Fourth Amendment violation is a Fourth Amendment violation. While the police may feel free to act with impunity, confident in the illusory protection of non-binding precedent, each search could still be violating the Constitution. Thus, where we have not yet ruled on the constitutionality of a police tactic, law enforcement personnel have two choices: (a) assume that their conduct violates the Fourth Amendment and that we will require them to obtain a warrant, or (b) gamble, at the risk of having evidence excluded, that we will find no Fourth Amendment violation in

---

language could only have favored the Government's argument if the GPS search occurred prior to the *Maynard* decision (*i.e.*, before any circuit had suggested that GPS searches violated the Fourth Amendment). However, once the circuits split on the issue of whether using a GPS tracker constitutes a search, law enforcement officials were on notice that such devices *could* "implicat[e] . . . Fourth Amendment rights" and the commentary became borderline irrelevant for good faith purposes.

a particular situation.[25]  This is in line with the Supreme Court's suggestion that law enforcement officials should be incentivized to "err on the side of constitutional behavior." *United States v. Johnson*, 457 U.S. 537, 561 (1982).[26]

[25] We do not hold, of course, that the police can never make assumptions about our future Fourth Amendment rulings.  We merely hold that where law enforcement personnel choose to take the constitutional analysis into their own hands, they effectively do so without a safety net:  If their analysis is correct and we ultimately affirm the constitutionality of a search, then the police are rewarded with full use of any evidence derived from the search.  If their analysis is wrong, however, and the search is ultimately held to be unconstitutional, then the police cannot avoid the cost of suppression by relying on the good faith exception.  Just as the police enjoy the benefits when they are correct, so, too, do they bear the costs when they are wrong.  Of course, the police can avoid this entire issue by requesting a warrant in the first instance.

[26] *Johnson* addressed retroactive application of Fourth Amendment decisions.  In discussing the matter, the Court stated:

If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior.  Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving

Excluding the evidence in this case would incentivize just that and would therefore result in "appreciable deterrence" of future Fourth Amendment violations. *Leon*, 468 U.S. at 909 (internal quotation marks omitted).

Thus, heeding the Supreme Court's views in *Herring* and *Davis*, and after considering the Government's various arguments, we find that the "deterrent effect of suppression [in this case is] substantial and outweigh[s] any harm to the justice system." *Herring*, 555 U.S. at 147. The police acted in the face of unsettled law at a time when courts were becoming more attuned to the argument that warrantless GPS surveillance violated the Fourth Amendment. Excluding the evidence here will incentivize the police to err on the side of constitutional behavior and help prevent future Fourth Amendment violations. We therefore conclude that the police actions taken here do not qualify under the good faith exception and hold that the exclusionary rule should apply in this case.[27]

---

the unsettled question. Failure to accord *any* retroactive effect to Fourth Amendment rulings would encourage police or other courts to disregard the plain purport of our decisions and to adopt a let's-wait-until-it's-decided approach.

*Johnson*, 457 U.S. at 561 (footnote and internal quotation marks omitted).

[27] It bears noting that we do not deal here with a situation where *some* on-point binding precedent exists. That is, we are not presented with a case wherein law enforcement personnel were asked to apply on-point binding appellate law to a new factual scenario. Indeed, we recognize that applying

## V.    STANDING AND THE KATZIN BROTHERS

Fourth Amendment rights are personal rights, and a defendant seeking to suppress evidence must therefore demonstrate a violation of his own Fourth Amendment rights before he can be granted any form of relief.  *See Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006).  Thus, having held that the District Court rightly suppressed the evidence found in Harry Katzin's van, we must now consider whether all three of the brothers had standing to challenge the admissibility of this evidence.  The Government would have us divide the stop into two distinct incidents: (1) the stop of Harry Katzin and (2) the stop of Mark and Michael Katzin, with each stop presenting a different constitutional situation.  For the reasons discussed below, we hold that the stop of Harry Katzin's van must be treated as a single incident implicating the Fourth Amendment rights of all three brothers and, consequently, we find that all three had standing.

_____

existing precedential frameworks to subtle factual permutations is something that police officers — and other law enforcement personnel — do all the time.  We have no occasion (or desire) to curtail such practices in this opinion.  Thus, for example, we do not purport to limit the ability of an officer to decide whether a particular situation gives rise to exigent circumstances while standing outside an apartment door with suspicious sounds emanating from within.  Such a case could lead to a different outcome under the *Herring* and *Davis* balancing test given that, unlike here, the officer would not be leaping recklessly into an unexplored constitutional situation.

We begin by stating the obvious: There is not, nor can there be, any dispute as to whether Harry Katzin — as the owner of the van — has standing to challenge the constitutionality of the GPS search as well as the stop and subsequent search of his van, and to seek suppression of any evidence discovered within the vehicle. Indeed, the Government concedes as much. (Appellant Br. at 69.) Certainly, then, the District Court rightly suppressed the evidence as against Harry Katzin.

The Government does challenge the standing of Mark and Michael Katzin. (*Id.* at 67-74.) Since "a search of a car does not implicate the rights of non-owner passengers," the Government contends that such passengers are "generally held to lack 'standing' to object to evidence discovered in a search of a vehicle." *Mosley*, 454 F.3d at 253 (citing *Rakas v. Illinois*, 439 U.S. 128, 147 (1978)). This much is true. However, we have also held that "when a vehicle is illegally stopped by the police, no evidence found during the stop may be used by the government against *any occupant* of the vehicle unless the government can show that the taint of the illegal stop was purged." *Id.* at 251.[28]

---

[28] We explicitly noted in *Mosley* that courts "should not be distracted by the fact that this case involves evidence found in a car." *Mosley*, 454 F.3d at 253. As *Mosley* explained, the constitutional violation stems not from the "search of the car . . . [but] the seizure of [the passenger]." *Id.* at 253 & n.6 ("[A] Fourth Amendment seizure of every occupant occurs the moment that vehicle is pulled over by the police.") The same is true of the case at bar: while the police did search Harry Katzin's van, this was done only after pulling the van to the side of the road, thereby "seizing" all three brothers.

This Court in *United States v. Mosley* considered the illegal stop and subsequent search of a vehicle carrying three individuals, during the course of which the police discovered several firearms from the car. We held that the stop and subsequent search of the car was to be treated as a single event, thereby rejecting an approach that would split the inquiry between several "individual constitutional violations, each with [its own] victim, each of whom may seek to suppress only the fruits of the violation of his individual rights." *Id.* at 257-58. In part, this conclusion was occasioned by our holding that "[t]he relationship between the seizure of a passenger in a moving vehicle, which necessarily occurs when that vehicle is stopped by the police, and the subsequent discovery of evidence during that stop, is one of ineluctable and undeniable correlation." *Id.* at 266. Additionally, while we acknowledged that "Fourth Amendment rights are personal rights," we also expressly rejected "blind adherence to a phrase which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth Amendment." *Id.* at 267 (quoting *Rakas*, 439 U.S. at 147). In light of our decision in *Mosley*, Mark and Michael Katzin argue that they have standing to challenge the admissibility of evidence seized from Harry Katzin's van by virtue of being subjected to an illegal stop that thereby rendered any evidence discovered in Harry Katzin's van fruit of the poisonous tree. *Id.* at 256 ("Where the traffic stop itself is illegal, it is simply impossible for the police to obtain the challenged evidence without violating the passenger's Fourth Amendment rights.") We agree.[29]

_____

[29] It bears noting that Mark and Michael Katzin challenge the

59

True, precedent exists to support the proposition that an individual cannot challenge the legality of a search which was executed based on information obtained as a consequence of some illegal search or seizure of a third party. *See, e.g.*, *United States v. Chase*, 692 F.2d 69, 70-71 (9th Cir. 1982). Such holdings are premised on the principle underlying the Government's position: Fourth Amendment rights "are personal and may be enforced by exclusion of evidence only by one whose own legal rights and interests were infringed by the search and seizure." *Id.* (discussing *Rakas v. Illinois*, 439 U.S. 128). The presence of *Mosley*, however, alters this analysis.

The Government effectively contends that we must treat the stop of Harry Katzin's van as constituting two stops: The first, a stop (*i.e.*, seizure) of Harry Katzin himself as a result of the GPS search. The second, a stop of Mark and Michael Katzin based on the probable cause developed through use of information derived from the GPS search. The Government would have us evaluate the legality and attendant Fourth Amendment consequences (if any) of each stop individually. We rejected this individualized approach in *Mosley*, holding instead that "an illegal traffic stop of a car occupied by a driver and a passenger [constitutes] a single constitutional violation, with [multiple] victims, each of whom can seek to suppress all fruits of that violation." *Mosley*, 454 F.3d at 257-58; *id.* at 267 ("It defies common

---

stop of Harry Katzin's van, not the GPS search itself. That in the course of challenging the stop this Court must necessarily consider the constitutionality of the GPS search is merely incidental: Mark and Michael seek to vindicate their own rights, not those of their brother.

sense and common experience to transmute one action into three, and we will not endorse a Fourth Amendment approach that relies on such a transmutation.") In effect, then, the illegality of the stop as it related to Harry Katzin is extended to his brothers (passengers). Consequently, we hold that Mark and Michael had standing to contest the stop and that the District Court rightly suppressed the evidence as to all three brothers.

## VI.    CONCLUSION

For the reasons discussed above, we will affirm the District Court's suppression of evidence discovered inside of Harry Katzin's van.

VAN ANTWERPEN, *Circuit Judge*, concurring in part and dissenting in part.

To briefly recap: In December 2010, law enforcement officers, after consulting an Assistant United States Attorney, and in accord with the general policy of the United States Department of Justice, magnetically attached an independently battery operated "slap on" Global Positioning System device ("GPS device" or "GPS") upon the undercarriage of Harry Katzin's vehicle, while that vehicle was parked on a public street. It was conceded at argument that the officers had probable cause to do so, although they did not obtain a warrant. For two days, law enforcement used that GPS to track the vehicle's whereabouts on public roads. The vehicle never entered a private garage, never entered the curtilage of a home, nor did it enter a similarly private area. The information from that GPS then led to the seizure of evidence and the arrest of Harry Katzin and his two brothers, due to their involvement in a major ongoing scheme to steal drugs from Rite Aid pharmacies.

At that time, the Supreme Court, in cases involving electronic beepers in vehicles, had held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see also United States v. Karo*, 468 U.S. 705, 713–16 (1984). All but one of the United States Court of Appeals to have addressed the issue, in light of *Knotts*, *Karo*, and other general Fourth Amendment principles, held that GPS or similar electronic surveillance ("GPS-like device" or "GPS-like") could be conducted in the same way that occurred here: without an authorizing warrant. This view was reflected in

1

then-current Rule 41(b) of the Federal Rules of Criminal Procedure, the commentary to which stated that a warrant was not required to conduct electronic vehicle surveillance "[i]f . . . the officers intend to install and use [an electronic surveillance] device without implicating any Fourth Amendment rights." FED. R. CRIM. P. 41(b) advisory comm. note (2006). No decision from our Circuit was on point. Then came *United States v. Jones*, 565 U.S. __, 132 S. Ct. 945 (2012).

In light of the Supreme Court's decision in *Jones*, and for the reasons discussed in the majority opinion, I agree that the Fourth Amendment now requires law enforcement officers to obtain a warrant, issued upon probable cause, before they install a GPS or a GPS-like device on a person's automobile, or other mobile property, and thereafter use that device to conduct continuing surveillance. *See* Majority Opinion ("Maj. Op.") at 18.[1]

I disagree, however, with the majority's conclusion that the District Court was correct to suppress the evidence obtained as a result of the warrantless GPS installation and subsequent surveillance. *See* Maj. Op. at 34–56. Given pre-*Jones* Supreme Court precedent, the consensus regarding GPS and GPS-like use across the federal courts, and other relevant considerations, I would hold that the law enforcement officers here acted "with an objectively 'reasonable good-faith belief' that their conduct [was]

---

[1] I also agree with the majority that, under our decision in *United States v. Mosely*, 454 F.3d 249 (3d Cir. 2006), each of the Katzin brothers has standing to seek suppression of the evidence obtained from Harry Katzin's vehicle.

2

lawful." *Davis v. United States*, 564 U.S. __, 131 S. Ct. 2419, 2427 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). For that reason, suppression in this case is unwarranted, and I would reverse the District Court.

## I.

It is indisputable that the installation and use of the GPS device in this case was a "search" under the Fourth Amendment. *See Jones*, 132 S. Ct. at 949. Furthermore, I agree with the majority that this particular search now requires a warrant, and that because the law enforcement officers here acted without a warrant a violation of the Fourth Amendment occurred. But "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009); *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010). *See also Illinois v. Gates*, 462 U.S. 213, 223 (1983) ("[W]hether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.").

The exclusionary rule "is a 'prudential' doctrine," *Davis*, 131 S. Ct. at 2426 (quoting *Pa. Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998)), utilized to "compel respect for the constitutional guaranty" embodied in the Fourth Amendment, *id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). *See also United States v. Brown*, 631 F.3d 638, 646 (3d Cir. 2011) ("[T]he exclusionary rule is merely a 'judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent

3

effect.'" (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974))). Suppression of evidence obtained through a violation of the Constitution is "'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Davis*, 131 S. Ct. at 2426 (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). And introduction of illegally obtained evidence at trial "work[s] no new Fourth Amendment wrong." *Calandra*, 414 U.S. at 354. Instead, the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426.

But application of the exclusionary rule is not warranted "in every circumstance in which it might provide marginal deterrence." *Herring*, 555 U.S. at 141 (quoting *Scott*, 524 U.S. at 368). Suppression is prudent only where it would "result in *appreciable* deterrence." *Leon*, 468 U.S. at 909 (emphasis added) (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)); *see also Davis*, 131 S. Ct. at 2426–27 (explaining that "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted'" (omission omitted) (quoting *Janis*, 428 U.S. at 454)); *Herring*, 555 U.S. at 141 (same); *Arizona v. Evans*, 514 U.S. 1, 11 (1995) (same); *Virgin Islands v. John*, 654 F.3d 412, 417 (3d Cir. 2011) (same). In other words, suppression is warranted only where its deterrence benefits outweigh the substantial social costs inherent in "preclud[ing] consideration of reliable, probative evidence." *Scott*, 524 U.S. at 364; *see also Davis*, 131 S. Ct. at 2427 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs."); *Tracey*, 597 F.3d at 151 ("To determine whether to apply the rule in a

4

particular case, we weigh the benefits of the rule's deterrent effects against the costs of exclusion . . . .").

The costs of suppression are substantial. "Exclusion exacts a heavy toll on both the judicial system and society at large." *Davis*, 131 S. Ct. at 2427. "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 908). But in addition to its "costly toll upon truth-seeking and law enforcement objectives," *Scott*, 524 U.S. at 364–65 (internal quotation mark omitted), "[i]ndiscriminate application of the exclusionary rule," in some circumstances, "may well 'generate disrespect for the law and administration of justice,'" *Leon*, 468 U.S. at 908 (alteration omitted) (quoting *Stone*, 428 U.S. at 491). Consequently, "[o]ur cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Davis*, 131 S. Ct. at 2427 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

Against these costs, "we weigh the benefits of the rule's deterrent effects." *Tracey*, 597 F.3d at 151. But we must fight any instinct to "'reflexive[ly]' appl[y]" the rule. *Davis*, 131 S. Ct. at 2427 (quoting *Evans*, 514 U.S. at 13). The necessary analysis calls for a "rigorous weighing of [the] costs and deterrence benefits," focusing primarily "on the 'flagrancy of the police misconduct' at issue." *Id.* (quoting *Leon*, 468 U.S. at 911). *See also John*, 654 F.3d at 417 (explaining that the exclusionary rule is "trigger[ed]" only where police conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such

5

deterrence is worth the price paid by the justice system" (quoting *Herring*, 555 U.S. at 144)).

Of course, "the deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue." *Davis*, 131 S. Ct. at 2427 (alteration omitted) (quoting *Herring*, 555 U.S. at 143). On the one hand, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144); *see also John*, 654 F.3d at 418 (condoning suppression where police conduct was "'deliberate, reckless, or grossly negligent'" (quoting *Tracey*, 597 F.3d at 151)). But on the other hand, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" *Davis*, 131 S. Ct. at 2427–28 (citations and internal quotation marks omitted) (quoting *Herring*, 555 U.S. at 137; *Leon*, 468 U.S. at 909, 908 n.6, 919).

Under this so-called "good-faith" exception to the exclusionary rule, beginning with *United States v. Leon*, the Supreme Court has consistently ruled that the costs of suppression are not outweighed by the little, if any, deterrent benefit of suppressing evidence obtained "in [a] reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Leon*, 468 U.S. at 909 (quoting *Gates*, 412 U.S. at 255 (White, J., concurring)); *see also Evans*, 514 U.S. at 11–12 ("[W]here the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable

way . . . ." (alteration in original) (internal quotation mark omitted) (quoting *Leon*, 468 U.S. at 919–20)); *Illinois v. Krull*, 480 U.S. 340, 348–49 (1987) ("[E]vidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975))); *Leon*, 468 U.S. at 922 n.23 ("[O]ur good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal . . . ."). Under such circumstances, "a reasonable officer cannot have been expected to know that what he was doing was unconstitutional," and, as a result, "he is unlikely to be discouraged in his actions by the knowledge that the fruits of his unconstitutional searches will be suppressed." *John*, 654 F.3d at 417. Thus, at bottom, "the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'" *Davis*, 131 S. Ct. at 2429 (quoting *Leon*, 468 U.S. at 919).

## II.

Admittedly, the majority posits several pages focused on the balancing test outlined in *Herring* and *Davis*; the test which I describe at length above. *See supra* Part I. But while purporting to consider whether, "in light of all the circumstances in this case," the law enforcement officers' conduct "rises to the level of a 'deliberate, reckless, or grossly negligent' violation of the Fourth Amendment," Maj. Op. at 48, the majority fragments its analysis by discussing whether *Knotts* and *Karo* and the cases from our sister circuits

7

addressing GPS and GPS-like devices are "binding appellate precedent" under *Davis*.

Of course, the question of whether *Davis*'s specific holding—that is, that law enforcement reliance on "binding appellate precedent" qualifies as objective good-faith conduct—lingers in the background of this case. In the event the Government were arguing that the law enforcement officers here relied on "binding appellate precedent," I would have no qualms with the majority addressing whether *Knotts* and *Karo* and the relevant cases from our sister courts properly qualified under that moniker. But, as the majority makes clear, that is not the Government's argument.

Furthermore, although a seemingly reasonable analytical choice, the majority's decision to first address whether those cases qualify as "binding appellate precedent" later infects the more general good-faith analysis. That is, the majority allows its conclusion that the "Beeper Cases" and the "Out-of-Circuit GPS Cases" are not "binding appellate precedent" to emaciate the weight given to law enforcement reliance thereon in the more general good-faith analysis.

In effect, the majority's search for *Davis*-like "binding appellate precedent" in this case places a heavy thumb on the scale in favor of suppression. Such an analysis does not comply with the *Leon* line of cases, which, since their inception, have time and again stated that the touchstone for the good-faith exception is "'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances,'" *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n.23); not whether the officers relied upon

8

"binding appellate precedent," or "some seemingly immutable authority or information," as the majority implies. *See* Maj. Op. at 36; *see also id.* at 49 ("Try as we might to allay our concerns, we remain supremely discomfited by the lack of binding appellate guidance underlying the police action in this case.").

At bottom, the majority claims that this case is "different." The officers here acted "different[ly]," (and, thus, sufficiently culpable so as to justify application of the exclusionary rule), the majority concludes, because the officers relied on "non-binding precedent" from our sister circuits and "extrapolate[ed] from, or analogiz[ed] to, existing case law" rather than seeking a warrant. Maj. Op. at 50. But the conclusion that this case is "different" results primarily from the majority's prior determinations that analogous and non-binding precedent are materially "different" from the "binding appellate precedent" dealt with in *Davis*; and, thus, without "binding appellate precedent," the rationale of *Davis* and the other good-faith cases do not apply.

I do not think this case is "different" from other cases involving the good-faith exception, where courts are presented with specific facts and particularities and then asked whether "a reasonably well trained officer would have known that the search [conducted] was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145 (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 922 n.23). *Davis* is obviously important because the facts in that case—officer reliance on "binding appellate precedent"—are the most analogous of the Supreme Court's several good-faith cases with which the Government, and we, have to work. Regardless, the predominant importance of *Davis* is its

9

affirmation of deterrence and police culpability as the lynchpins of the exclusionary rule analysis. The majority thus erroneously elevates the "binding appellate precedent" language to its own good-faith test instead of treating it as a single consideration in the exclusionary rule analysis.

Nevertheless, "of great significance to the instant case," the majority insists, "is the fact that in *Davis* the police relied on binding appellate precedent that '*specifically authorize*[*d* the] particular police practice.'" Maj. Op. at 39 (quoting *Davis*, 131 S. Ct. at 2429). Thus, the majority stresses, that *Davis* must be read as "extend[ing] good faith protection only to acts that are explicitly sanctioned by clear and well-settled precedent." Maj. Op. at 40. First, I take great issue with the majority's suggestion that the good-faith exception was "extend[ed]" by *Davis*, or any other case, "only" to the specific factual circumstances therein. Courts apply a single good-faith exception to either condone or condemn varying factual circumstances. *See Davis*, 131 S. Ct. at 2428 ("The Court has over time applied [the] 'good-faith' exception across a range of cases.").

More importantly, the *Davis* dissent, other courts, and commentators do not read the *Davis* majority's articulation of the good-faith exception as limited to only "binding appellate precedent." *See Davis*, 131 S. Ct. at 2439 (Breyer, J., dissenting) ("[A]n officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment's bounds is no more culpable than an officer who follows erroneous 'binding precedent.' Nor is an officer more culpable where circuit precedent is simply suggestive rather than 'binding,' where it only describes how to treat

10

roughly analogous instances, or where it just does not exist."); *United States v. Sparks*, 711 F.3d 58, 63 (1st Cir. 2013) ("The [*Davis*] Court's emphasis on the absence of police culpability could be read to imply that good-faith reliance on out-of-circuit appellate precedent is also acceptable."); *United States v. Baez*, 878 F. Supp. 2d 288, 294–95 (D. Mass. 2012) ("Baez argues that *Davis* should be limited to its precise holding. . . . [But] th[at] interpretation is entirely too static . . . . It is apparent that both the majority opinion and the concurring and dissenting opinions anticipated the principles of *Davis* would be worked out in subsequent cases raising themes and variations."); Orin S. Kerr, *Fourth Amendment Remedies and Development of the Law: A Comment on* Camreta v. Greene *and* Davis v. United States, 2011 CATO SUP. CT. REV. 237, 255 (2011) ("If the exclusionary rule solely concerns culpability . . . its [sic] hard to see why binding precedent is required. Reliance on binding precedent seems inherently reasonable, but reliance is often reasonable without binding precedent. A local police officer who conducts a search widely upheld among the circuits but not yet addressed by the [U.S. Court of Appeals] in his jurisdiction is no more culpable than an officer who conducts a search upheld only by his regional circuit. If the former has acted reasonably, then surely so has the latter.").[2]

---

[2] The majority supports its limiting reading of *Davis* by pointing to the opinion below from the Eleventh Circuit, and several similar cases from our sister circuits, wherein courts "stress. . . that [the] precedent on a given point must be unequivocal before [those courts would] suspend the exclusionary rule's operation." *United States v. Davis*, 598 F.3d 1259, 1266 (11th Cir. 2010); *see also United States v. McCane*, 573 F.3d 1037, 1045 (10th Cir. 2009) ("Relying

Finally, the majority argues that *Davis* itself forecloses the conclusion that law enforcement reliance on analogous or non-binding out-of-circuit precedent could ever constitute good faith. Quoting language from *Davis*,[3] the majority

upon the settled case law of a United States Court of Appeals certainly qualifies as an objectively reasonable law enforcement behavior."); *United States v. Jackson*, 825 F.2d 853, 866 (5th Cir. 1987) ("The exclusionary rule should not be applied to searches which relied on Fifth Circuit law prior to the change of that law . . . ."); *id.* at 878 (Hill, J., concurring) ("Outside of situations where we have authorized the specific conduct undertaken and then later declared it unconstitutional, I believe the analogy to *Leon* and *Krull* weakens and the exception should probably not be applied."). But the Supreme Court refrained from creating a similar restraint. *See Davis*, 131 S. Ct. at 2435–36 (Sotomayor, J., concurring) (noting that *Davis* left "the markedly different question [of] whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled . . . unanswered"). I therefore hesitate before reading into *Davis* a limitation apparently at odds with its rationale. *See* Kerr, *supra* at 255.

[3] The language quoted by the majority reads as follows:

> This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals. If one or even many of these courts uphold a particular type of search or seizure, defendants in jurisdictions in which the question remains open will still have an

12

claims that the case explained that "its holding was limited to jurisdiction[s] where the law was clearly settled." Maj. Op. at 42 n.17. But the language to which the majority refers, quoted in full at footnote 3, *supra*, is pure dicta, responding not to an argument about what the good-faith exception should or should not apply to but to the policy concern that "applying the good-faith exception to searches conducted in reliance on binding precedent will stunt the development of Fourth Amendment law." *Davis*, 131 S. Ct. at 2432; *see also id.* at 2433 ("[A]pplying the good-faith exception in this context will not prevent judicial reconsideration of prior Fourth Amendment precedents.").[4] Furthermore, directly

---

> undiminished incentive to litigate the issue. This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted.

*Davis*, 131 S. Ct. at 2433.

[4] As an aside, I fail to see how allowing law enforcement reliance on analogous or non-binding out-of-circuit precedent to influence substantially the good-faith analysis would foreclose development of Fourth Amendment law. *Leon* made clear that "[t]here is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question [of] whether the Fourth Amendment has been violated." 468 U.S. at 924. "Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies" which federal courts are "empower[ed] . . . to adjudicate"; and "courts have considerable discretion in conforming their

preceding this brief discussion, the Court reiterated that the sole focus of the exclusionary rule is "deterrence of culpable law-enforcement conduct." *Id.* at 2432–33.

In short, I disagree with the way the majority's opinion reads to suggest that *Davis* alone answers the questions presented in this appeal. In *Davis*, the Court was presented with a unique set of facts to which its holding was expressly directed: officer reliance on "binding appellate precedent" later overruled. *See Davis*, 131 S. Ct. at 2429. Identified by both the concurrence and the dissent, *Davis* did not touch the questions of "whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled," *id.* at 2435 (Sotomayor, J., concurring), or "where circuit precedent is simply suggestive rather than 'binding,' where it only describes how to treat roughly analogous instances, or where it just does not exist," *id.* at 2439 (Breyer, J., dissenting).

Of paramount importance to this case is that the reasoning underlying *Davis* does address those questions. *Davis* and the Court's good-faith jurisprudence teach us that we must look at the totality of the circumstances and ask whether, in light of those circumstances, the officers were acting with "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," which would justify suppression, or, instead, whether they were acting "with an objectively reasonable good-faith belief that their conduct [was] lawful" or "involve[d] only simple, isolated negligence." *Davis*, 131 S. Ct. at 2427–28 (citations and

decisionmaking processes to the exigencies of particular cases." *Id.* at 924–25.

14

internal quotation marks omitted). For that reason, I disagree with the majority's conclusion that authority falling outside the specific semblance of *Davis* is "different" and thus always insufficient to support a finding of good-faith in every circumstance.

In *Davis*, the Court explained that *Leon* "imported" the reasoning of *United States v. Peltier*, 422 U.S. 531 (1975) "into the good-faith inquiry." *Davis*, 131 S. Ct. at 2432. In *Peltier*, border patrol agents conducted a stop-and-search of an automobile "within a reasonable distance from" the Mexican border pursuant to a federal statute, federal regulations promulgated in accordance with that statute, and a "continuous judicial approval" of "the statute and the . . . policy" across the federal courts. *Peltier*, 422 U.S. at 540–42. Although that statute and policy were overturned by the Court's decision in *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), the *Peltier* Court refrained from applying the exclusionary rule. *See id.* at 542.

Essential to the *Peltier* Court's decision was the now-familiar reasoning that "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* Especially relevant here, the Court stated that "unless we are to hold that parties may not reasonably rely upon any legal pronouncement emanating from sources other than this Court, we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional norm." *Id.*

Thus, if the logic of *Peltier* was "imported . . . into the good-faith inquiry" as *Davis* states, 131 S. Ct. at 2432, then a "uniform treatment" of a particular law enforcement act by the federal judiciary or a "prevailing . . . norm" can, in the proper circumstances, support a finding of good faith. *See Herring*, 555 U.S. at 145 ("'[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" (quoting *Leon*, 468 U.S. at 922 n.23)); *cf. United States v. Duka*, 671 F.3d 329, 347 n.12 (3d Cir. 2011) (noting that "[t]he objective reasonableness of the officers' reliance on the statute . . . is further bolstered by the fact that the particular provision at issue had been reviewed and declared constitutional by several [out-of-circuit] courts" (citing *Davis*, 131 S. Ct. at 2434)).

All in all, my problem with the method of the majority's good-faith analysis is that it myopically focuses too much on the facts and narrow holdings of *Davis* and other good-faith cases, and considers too little, if at all, the reasoning and principles of law underlying those decisions. The majority's analysis is a search for some sort of "immutable authority or information that justifies [the law enforcement officers'] course of action." *See* Maj. Op. at 36. But the good-faith exception to the exclusionary rule is not limited to those circumstances. The good-faith inquiry, like other Fourth Amendment analyses, requires us to "slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).[5] The question is,

_____

[5] The majority insinuates that my analysis would "burden district courts with [an unwarranted] type of case-by-

16

and always has been, whether the officers acted with a "reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Leon*, 468 U.S. at 909 (quoting *Gates*, 462 U.S. at 255 (White, J., concurring)); *see also Davis*, 131 S. Ct. at 2427–28; *Herring*, 555 U.S. at 145; *Evans*, 514 U.S. at 11–12; *Krull*, 480 U.S. at 348–49. *Davis* answers "yes" to police actions taken in reliance on "binding appellate precedent." *Davis*, 131 S. Ct. at 2429. *See also Herring*, 555 U.S. at 147–48 (answering "yes" where officers relied on an error in a police-maintained outstanding warrant database); *Evans*, 514 U.S. at 14–16 (answering "yes" where officers relied on an error in court-maintained database); *Krull*, 480 U.S. at 349–50 (answering "yes" where officers relied on a subsequently invalidated statute); *Leon*, 468 U.S. at 922 (answering "yes" where officers relied on a subsequently invalidated warrant). What we are asked to answer is whether the result is the same when officers act in

---

case assessment," and create "a sprawling, amorphous, and self-contradicting doctrine." Maj. Op. at 45. But all of the questions that the majority fears—i.e., "how many circuits had addressed the police practice in question, what each one said, whether the statements were mere dicta"; and "what if our sister courts had all ruled in near-unanimity on a point, with one stalwart (perhaps, highly persuasive) holdout?"— are exactly the sorts of questions we should be asking; particularly where the Supreme Court instructs us to answer the good-faith question by focusing on whether "a reasonably well trained officer would have known that the search [conducted] was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145 (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 922 n.23).

17

the circumstances in which they did here. As the following analysis shows, I answer that question in the affirmative.

## III.

## A.

Before determining if the officers in this case acted with an objectively reasonable belief that their conduct complied with the Fourth Amendment, we must first determine what, precisely, their conduct was. *Jones* lumps the police conduct that occurred here into a singular act, *see Jones*, 132 S. Ct. at 949 (installation of a GPS *and* its use to monitor a vehicle are a search), as does the majority. But before *Jones*, GPS or GPS-like surveillance was often treated as two distinct acts: (1) the installation of the GPS or GPS-like device, and (2) the subsequent surveillance of the automobile.[6] Thus, for the purpose of my exclusionary rule analysis, I find it appropriate to similarly separate the officers' conduct here into those two distinct Fourth Amendment acts. *See Sparks*, 711 F.3d at 66–67 (bifurcating

---

[6] *See, e.g.*, *Karo*, 468 U.S. at 711–13 (analyzing Fourth Amendment implications of beeper installation); *id.* at 713–18 (analyzing Fourth Amendment implications of beeper surveillance); *Knotts*, 460 U.S. at 280 n.\*\* (certiorari granted on Fourth Amendment implications of beeper *use* and "pass[ing]" on the issue of beeper installation); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215–16 (9th Cir. 2010) (analyzing GPS installation separately from GPS use); *United States v. Moore*, 562 F.2d 106, 111–12 (1st Cir. 1977) (same, but with beepers).

its exclusionary rule / good-faith exception analysis with regard to, first, the GPS's installation and, second, its subsequent monitoring).[7]

## B.

Application of the exclusionary rule depends on whether the officers, at the time they were acting, would have or should have known their installation of the GPS and their

---

[7] I pause to note that separating GPS use into these two distinct Fourth Amendment acts is not appropriate for determining whether a Fourth Amendment search has occurred. The *Jones* majority clearly rejected the concurrence's suggestion that it do so. *Compare Jones*, 132 S. Ct. at 951 n.5 (finding the distinction between GPS "installation" and "use" irrelevant for determining whether a Fourth Amendment "search" had occurred, reasoning "[a] trespass on 'houses' or 'effects,' or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy"), *with id.* at 958 (Alito, J., concurring) (finding it a "questionable proposition that [the] two procedures cannot be separated for purposes of the Fourth Amendment analysis," and reasoning that it is clear that both the "installation" and "use" of the GPS, on their own, do not constitute a search). But it is conceded that a search *did* occur in this case. My analysis focuses on an entirely different question; to wit: whether the officers would have known, at the time of their actions, that their conduct was a "search." Because, as discussed in *supra* note 6, this question was often bifurcated at the time, my analysis proceeds accordingly.

subsequent use of the GPS to track Harry Katzin's vehicle were unconstitutional. *See Krull*, 480 U.S. at 348–49. Relevant to this determination are the Supreme Court's case law dealing with electronic surveillance and general searches of automobiles, subsequent treatment of GPS and GPS-like surveillance across the federal courts, and other considerations.

## 1.

*United States v. Knotts*, 460 U.S. 276 (1983) and *United States v. Karo*, 468 U.S. 705 (1984) are the authorities most relevant to our analysis. In *Knotts*, Minnesota law enforcement officers utilized an electronic beeper to conduct surveillance on a vehicle driven by a man suspected to be part of an illegal narcotics operation. 468 U.S. at 277–80. In determining the Fourth Amendment implications of that activity, the Court determined that the alleged search "amounted principally to the following of an automobile on public streets and highways." *Id.* at 281. The Court rejected the argument that this constituted a search under the Fourth Amendment, and held that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."[8] *Id.* Because when one drives an automobile on

_____

[8] At the time, this holding was in accord many of the courts of appeals to have addressed the issue. A compelling number of courts found beeper surveillance did not implicate the Fourth Amendment. *See, e.g.*, *United States v. Michael*, 645 F.2d 252, 257–58 (5th Cir. 1981) (en banc) (holding "subsequent monitoring," after installation of beeper upon reasonable suspicion, "did not violate . . . reasonable

20

expectation[s] of privacy"); *United States v. Hufford*, 539 F.2d 32, 33–34 (9th Cir. 1976) (holding one's movements in his vehicle on a public road "were knowingly exposed to the public, and therefore are not a subject of Fourth Amendment protection"), *partially overruled by Jones*, 132 S. Ct. 945, *as recognized by United States v. Pineda-Moreno*, 688 F.3d 1087, 1091 (9th Cir. 2012); *cf. United States v. Bruneau*, 594 F.2d 1190, 1196–97 (8th Cir. 1979) (holding that "monitoring the airborne location of an aircraft with a [beeper] is not a search within the fourth amendment"); *United States v. Clayborne*, 584 F.2d 346, 350–51 (10th Cir. 1978) (holding use of beeper "as a substitute for persistent extensive visual" surveillance, when it enters a "clandestine laboratory" exposed to "outside viewing" and "ingress and egress of the public" did not per se violate the Fourth Amendment).

Alternatively, some courts alluded that it implicated a person's privacy interests, but did not hold such surveillance required a warrant. *See, e.g.*, *United States v. Moore*, 562 F.2d 106, 111–12 (1st Cir. 1977) (holding beeper surveillance requires probable cause, but no warrant), *abrogated by United States v. Knotts*, 460 U.S. 276, 286 (1983), *as recognized by United States v. Sparks*, 711 F.3d 58, 65 (1st Cir. 2013) ("*Knotts* . . . abrogated *Moore*'s probable cause requirement for beeper surveillance . . . ."); *cf. United States v. Shovea*, 580 F.2d 1382, 1387–88 (10th Cir. 1978) ("The utilization of an electronic tracking device, without prior court approval, may be justified by probable cause and exigent circumstances."). Conversely, a few cases did require a formal warrant; but many of those cases involved installations and surveillance occurring in private areas. *See, e.g.*, *United*

21

public roads, he "voluntarily convey[s] to anyone who want[s] to look"[9] his location, progress, and route, he has no

_____

*States v. Bailey*, 628 F.2d 938, 944, 945–46 (6th Cir. 1980). That was not the case in *Knotts*, nor is it the case here.

The Fifth Circuit at one time held that beeper surveillance plainly implicated the Fourth Amendment. *See United States v. Holmes*, 521 F.2d 859, 865–67 (5th Cir. 1975) ("A person has a right to expect that when he drives his car into the street, the police will not attach an electronic surveillance device to his car in order to track him. Although he can anticipate visual surveillance, he can reasonably expect to be 'alone' in his car when he enters it and drives away. . . . The[] failure to obtain a warrant is fatal."). But that view seems to have been abrogated, if not overruled, by later pre-*Knotts* cases. *See Michael*, *supra*.

[9] The proposition that one has no reasonable expectation of privacy in information willingly conveyed to third parties remains unquestioned. *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *see also, e.g.*, *California v. Greenwood*, 486 U.S. 35, 40–41 (1988) (no reasonable expectation of privacy in garbage bags willingly left on street curb for pick up by third party). *But see Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring) ("[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.").

22

reasonable privacy interest in "whatever stops he ma[kes]" nor his "final destination" or otherwise. *Id.* at 281–82.[10]

---

[10] The *Knotts* Court also based its holding on the similarly well-established "open fields" doctrine, *see Air Pollution Variance Bd. of Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 864–65 (1974); *United States v. Lee*, 274 U.S. 559, 563 (1927); *Hester v. United States*, 265 U.S. 57, 59 (1924), stating the beeper's ability to enhance visual surveillance was of no consequence. *Knotts*, 460 U.S. at 282 ("Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case."); *see also Boyd v. United States*, 116 U.S. 616, 628 (1886) ("'The eye cannot . . . be guilty of a trespass . . . .'" (quoting *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765))). Technological enhancements of purely visual surveillance have, since *Knotts*, received similar treatment. *See Florida v. Riley*, 488 U.S. 445, 488–52 (1989) (aerial surveillance of interior of partially covered greenhouse from a helicopter 400 feet overhead is not a search); *Dow Chem. Co. v. United States*, 476 U.S. 227, 238–39 (1986) (aerial photographs taken from an airplane over an industrial complex are not searches); *California v. Ciraolo*, 476 U.S. 207, 211–14 (1986) (aerial surveillance of an open greenhouse from an airplane 1,000 feet overhead is not a search); *Texas v. Brown*, 460 U.S. 730, 739–40 (1983) (plurality opinion) (using flashlight to look into car interior and open glove compartment at night is not a search). *But see Kyllo v. United States*, 533 U.S. 27, 33–34 (2001) (use of infrared light technology to detect heat waves radiating off a home is a search because that information "could not otherwise have been obtained without physical intrusion into

A little over a year later, the Court reaffirmed this conclusion in *Karo*. But *Karo* clarified that the use of beepers to monitor cars and other objects was not without limits. Only in situations in which officers employ electronic devices to obtain information that could otherwise be obtained by visual surveillance in public places are officers able to rely upon *Knotts*'s holding. *See Karo*, 468 U.S. at 713–16. Thus, the use of a beeper to monitor objects within private residences implicates the Fourth Amendment and requires a warrant. *See id.* at 714, 717–18.

What *Knotts* initially left undecided, however, was whether the installation of the beeper was a search under the Fourth Amendment. *See Knotts*, 460 U.S. at 290 n.**; *id.* at 286 (Brennan, J., concurring). In both *Knotts* and *Karo*, the officers themselves neither installed nor placed the beepers onto or into the vehicles. In *Knotts*, the officers, with the consent of a chemical manufacturing company, installed a beeper inside a container for chemicals. The company agreed that the next time a suspected narcotics manufacturer came to purchase chemicals, they would put the chemicals he purchased in that particular container. After purchasing the chemicals, the suspect willingly placed the bugged container into his car, allowing the police to easily monitor his movements. 460 U.S. at 278. In *Karo*, the officers cooperated with a government informant so as to ensure that Karo, who was suspected of manufacturing narcotics, was similarly duped into purchasing a container of chemicals

a constitutionally protected area" and "the technology in question [was] not in general public use" (internal quotation marks omitted) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1960))).

containing a beeper. Once the purchase had occurred, and Karo placed the container in his car, the officers utilized the beeper to monitor his movements. 468 U.S. at 708.

*Karo* held that where officers arrange for a suspect to obtain an item containing a beeper, even if the suspect has no knowledge of the item's foreign tenant, that transfer did not intrude upon that suspect's reasonable expectations of privacy. *Id.* at 712. In short, the transfer "created a *potential* for an invasion of privacy," but the mere fact that officers arranged for a beeper to come into the possession of an individual or into an individual's property "infringed no privacy interest." *Id.* Moreover, *Karo* reasoned that "[a]t most, there was a technical trespass on the space occupied by the beeper." *Id.* But the Court concluded that "[t]he existence of a physical trespass is only marginally relevant to the question of whether the Fourth Amendment has been violated . . . , for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." *Id.* at 712–13.[11] As a result, the Court held that "any impairment of . . .

---

[11] *Karo*'s conclusion that "an actual trespass is neither necessary nor sufficient to establish a constitutional violation" was, until *Jones*, sacrosanct in Fourth Amendment law. In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court turned Fourth Amendment questions away from their common-law trespass foundation. *See* 389 U.S. at 353 ("[T]he trespass doctrine . . . can no longer be regarded as controlling."). Thereafter, the Fourth Amendment touchstone was whether the government had intruded upon a person's reasonable expectations of privacy. *See id.* at 360 (Harlan, J., concurring); *see also Jones*, 132 S. Ct. at 950; *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006) ("[T]he Fourth

Amendment's protection against unreasonable searches is predicated on the invasion by the government of a person's reasonable expectation of privacy . . . ."). For instance, in *Oliver v. United States*, 466 U.S. 170 (1984), the police officers undoubtedly trespassed upon the petitioner's property. But, because it was found that the officers were trespassing upon only the "open fields" of petitioner's property, he could not "demand privacy" for activities conducted or incriminating evidence found upon that property. 466 U.S. at 177–78. The vast consensus was, then, that a physical "trespass"—regardless of whether it would have been considered an actual "trespass" under the common law—became a "search" only when that trespass infringed upon a person's reasonable expectation of privacy. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."); *United States v. Acosta*, 965 F.2d 1248, 1256–57 (3d Cir. 1992). Indeed, the courts of appeals addressing the Fourth Amendment implications of GPS and GPS-like installation after *Knotts* and *Karo* made little of the physical trespass that occurred when police installed devices directly upon automobiles, primarily because the invasion of privacy that occurred was minimal or non-existent. *See United States v. Marquez*, 605 F.3d 604, 609–10 (8th Cir. 2010); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215 (9th Cir. 2010); *United States v. Garcia*, 474 F.3d 994, 997 (7th Cir. 2007); *United States v. McIver*, 186 F.3d 1119, 1126–27 (9th Cir. 1999); *see also United States v. Michael*, 645 F.2d 252, 257–58 (5th Cir. 1981).

26

privacy interests that may have occurred was occasioned by the monitoring of the beeper," not its installation. *Id.* at 713.[12]

Thus, at bottom, before *Jones*, *Knotts* and *Karo* established that no Fourth Amendment search occurred where officers use beeper-based electronics to monitor an automobile's movements on public roads because a person has no reasonable expectation of privacy with regard to that information. But, because the facts of *Karo* correspondingly limited its holding, those cases did not address whether installation of a beeper onto or into a vehicle, in all circumstances, was a search. Nonetheless, *Karo*'s reasoning regarding the Fourth Amendment implications of a beeper installation on an automobile is telling, and was certainly informative in the subsequent treatment of the issue throughout the federal courts.

Additionally, several other well settled Fourth Amendment principles are relevant. Before *Jones*, the

---

[12] The *Karo* Court also rejected the argument that the transfer of the bugged container constituted a seizure, holding that no "possessory interest was interfered with in a meaningful way." *Karo*, 468 U.S. at 712; *see also id.* ("A 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Later cases did not disturb this holding, *see, e.g.*, *United States v. Garcia*, 474 F.3d 994, 996 (7th Cir. 2007), and Appellees here do not allege the GPS installation or subsequent surveillance was a seizure.

27

Supreme Court had made perfectly clear that persons did not enjoy a reasonable expectation of privacy in the exterior of their automobiles. *New York v. Class*, 475 U.S. 106, 114 (1986); *see also Cardwell v. Lewis*, 417 U.S. 583, 591 (1974). Similarly axiomatic were the principles that a simple "trespass" or "physical intrusion" alone, absent an infringement upon a reasonable expectation of privacy, was not a "search," *see supra* Note 11; that information willingly conveyed to third parties, such as when a car "travels public thoroughfares where its occupants and its contents are in plain view," *Cardwell*, 417 U.S. at 590, retains no reasonable expectation of privacy, *see supra* Note 9; and that objects willingly placed or left in the "open fields," regardless of whether those fields are trespassed upon, *see Oliver*, 466 U.S. at 177–80, do not enjoy a reasonable expectation of privacy, *see supra* Note 10.

**2.**

After *Knotts* and *Karo*, what resulted was a uniform consensus across the federal courts of appeals to address the issue that the installation and subsequent use of GPS or GPS-like device was not a search or, at most, was a search but did not require a warrant. *See, e.g.*, *United States v. Marquez*, 605 F.3d 604, 609–10 (8th Cir. 2010) (reasoning that installation and use of GPS requires only reasonable suspicion, since monitoring on public roads is not a search); *United States v. Pineda-Moreno*, 591 F.3d 1212, 1215–16 (9th Cir. 2010) (holding that GPS installation and use was not a search); *United States v. Garcia*, 474 F.3d 994, 997–98 (7th Cir. 2007) (same); *United States v. McIver*, 186 F.3d 1119, 1126–27 (9th Cir. 1999) (same); *see also United States v. Michael*, 645 F.2d 252, 256–58 (5th Cir. 1981) (en banc)

28

(holding that installation and use of beeper requires only reasonable suspicion, since monitoring on public roads is not a search).[13]

Most federal district courts, including the Middle District of Pennsylvania, had reached the same result. *United States v. Jesus-Nunez*, No. 1:10-cr-00017-01, 2010 WL 2991229, \*\*3–5 (M.D. Pa. July 27, 2010) ("Since there was no Fourth Amendment search or seizure by the Government's use of the GPS device, the court finds that the agents did not need probable cause or even reasonable suspicion to attach and monitor the [GPS] device to Defendant's cars."); *e.g.*, *United States v. Burton*, 698 F. Supp. 2d 1303, 1307–08 (N.D. Fla. 2010); *United States v. Moran*, 349 F. Supp. 2d 425, 467–68 (N.D.N.Y. 2005).

The only case to break from this consensus was *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010). In *Maynard*, the D.C. Circuit held that prolonged use of a GPS device to monitor the movements of defendant Jones's vehicle "24 hours a day for four weeks," was a "search" under the Fourth Amendment. 615 F.3d at 555. According to the D.C. Circuit, *Knotts* was not controlling of the question, as the court reasoned that *Knotts*'s holding endorsed only that

---

[13] *Michael* was also the law in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (decisions of the Fifth Circuit prior to October 1, 1981 are binding on the Eleventh Circuit); *United States v. Smith*, 387 F. App'x 918, 920–21 (11th Cir. 2010) (unpublished) (citing *United States v. Michael*, 645 F.2d 252 (5th Cir. 1981) to support the proposition that GPS installation was not a search).

"'[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another,' not that such a person has no reasonable expectation of privacy in his movements whatsoever, world without end." *Id.* at 557 (alteration in original) (citation omitted) (quoting *Knotts*, 460 U.S. at 281). The court reasoned that the Supreme Court in *Knotts*, and the later cases across the courts of appeals, all "reserved" the issue of "whether 'wholesale' or 'mass' electronic surveillance of many individuals requires a warrant." *Id.* at 558.[14]

As a result, the court concluded that although it may be "one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work," it is a whole other thing "for that stranger to pick up the scent again the next day and the day after that, week in and week out, dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine." *Id.* at 560. The court's analysis in *Maynard*, therefore, was focused not on the installation of the device but rather the prolonged use

---

[14] The Supreme Court in *Knotts*, in response to the argument that its holding would allow "twenty-four hour surveillance of any citizen of this country . . . without judicial knowledge or supervision," opined that "the 'reality hardly suggests abuse,'" and suggested that "if such dragnet-type law enforcement practices . . . should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." *Knotts*, 460 U.S. at 283–84 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 566 (1978)).

of the GPS and the quality and quantity of information obtained over an extended period of time. *Id.* at 562 ("Prolonged surveillance reveals types of information not revealed by short-term surveillance, such as what a person does repeatedly, what he does not do, and what he does ensemble. These types of information can each reveal more about a person than does any individual trip viewed in isolation.").[15]

Other than *Maynard*, only a handful of dissenting opinions questioned *Knotts*'s and *Karo*'s holdings or their applicability to GPS installation and subsequent surveillance. *See Karo*, 468 U.S. at 736 (Stevens, J., dissenting) ("The impact of beeper surveillance upon interests protected by the Fourth Amendment leads me to what I regard as the perfectly sensible conclusion that absent exigent circumstances Government agents have a constitutional duty to obtain a warrant before they install an electronic device on a private citizen's property."); *United States v. Pineda-Moreno*, 617 F.3d 1120, 1124–26 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc) (arguing that

---

[15] I pause here to note that the majority characterizes *Maynard* as having held that the mere act of attaching a GPS device onto a person's vehicle for the purpose of conducting continual surveillance, alone, constituted a search. *See* Maj. Op. at 16; *see also id.* at 27 n.9 (describing that *Maynard* "explained that warrantless installation of a GPS device by the police was *per se* unreasonable under the Fourth Amendment"). Such a characterization is unfaithful to the panel's opinion, which explicitly tailored its holdings to the fact that the surveillance conducted in that case lasted for a month. *See Maynard*, 615 F.3d at 558, 560.

31

GPS surveillance is a search because GPS devices "have little in common with the primitive devices in *Knotts*," and provide officers "the power to track the movements of every one of us, every day of our lives"); *Michael*, 645 F.2d at 260–70 (Tate, J., dissenting) (disagreeing with majority that "an individual living under our Constitution has no reasonable expectation of privacy such as would protect him from a trespass upon his property by governmental agents, a trespass that enables them to maintain continuous electronic surveillance over his movements twenty-four hours per day continuously and indefinitely").

**3.**

I also find several other considerations relevant. First, and most important, is Rule 41(b) of the Federal Rules of Criminal Procedure, which governs the issuance of warrants in all federal criminal proceedings. The 2006 Advisory Committee's Note explains that Rule 41(b) was amended, in part, to "address the use of tracking devices." Fed. R. Crim. P. 41(b) advisory comm. note (2006). In describing the ideal procedure, the Note states that "[w]arrants may be required to monitor tracking devices when they are used to monitor persons or property in areas where there is a reasonable expectation of privacy." *Id.* (citing *Karo*, 468 U.S. 705). Elaborating, the note instructs that "if the officers intend to install or use the device in a constitutionally protected area, they must obtain judicial approval to do so." *Id.* But, "[i]f, on the other hand, the officers intend to install and use the device without implicating any Fourth Amendment rights, there is no need to obtain the warrant." *Id.* (citing *Knotts*, 460 U.S. 276).

Moreover, the law enforcement officers consulted with an Assistant United States Attorney before conducting the installation of the GPS unit and the subsequent surveillance. (*See* Appellant Br. at 56.) I agree with the majority that "a government attorney's approval, standing alone, cannot and should not suffice to demonstrate good faith." Maj. Op. at 52 n.23. But, as Appellees' attorney conceded at oral argument, it is certainly another consideration to take into account in the good-faith analysis. (*See* Oral Arg. Trans. at 52: 4–6 (conceding that the officers' reliance on the opinion of an Assistant United States Attorney was "a factor to look at" in determining whether the officers acted in good faith).) *See also Tracey*, 597 F.3d at 153 (concluding that approval from a government attorney, *inter alia*, was one consideration evidencing that "[a] reasonable officer would . . . have confidence in the validity of the [search]"); *United States v. Otero*, 563 F.3d 1127, 1134 (10th Cir. 2009) (same); *United States v. Fama*, 758 F.2d 834, 837 (2d Cir. 1985) (same).

## IV.

In my view, in light of the legal landscape discussed above, when the officers installed the GPS device[16] upon the undercarriage of Harry Katzin's vehicle, and then used that

---

[16] By "installed the GPS device," of course, I mean that the officers magnetically attached the "slap on" GPS device upon the undercarriage of Harry Katzin's vehicle. That device was totally independent of the car, operating under its own power. Also, it was not physically installed onto the car using screws, adhesives, or otherwise. Its attachment was occasioned only magnetically. Thus, for the purpose of my analysis, I focus on those facts.

33

device to monitor the vehicle's movements for two days while it traversed public thoroughfares, those officers were acting with "an objectively 'reasonable good-faith belief' that their conduct [was] lawful." *Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909). I find that the officers' actions in this case do not "exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights," *id.* (quoting *Herring*, 555 U.S. at 144), and, thus, "the deterrent value" of excluding the evidence found pursuant to the officers' conduct would not "outweigh the resulting costs." *Id.* Simply put, in this case, "exclusion cannot not 'pay its way.'" *Id.* at 2428 (quoting *Leon*, 468 U.S. at 908 n.6).

## A.

The officers here were acting with an objectively reasonable good-faith belief that their warrantless installation of the GPS device upon the undercarriage of Harry Katzin's automobile did not run afoul of the Fourth Amendment.

Based on fundamental Fourth Amendment principles which would have been familiar to any reasonably well trained law enforcement officer, there was no possibility that the officers, at the time they installed the GPS upon Harry Katzin's vehicle, would have "had knowledge"—nor could we now "charge[] [them] with knowledge"—"that the search was unconstitutional under the Fourth Amendment." *Krull*, 480 U.S. at 348–49 (quoting *Peltier*, 422 U.S. at 542).

Before *Jones*, the touchstone of any Fourth Amendment analysis was whether the Government had invaded upon a person's reasonable expectation of privacy.

34

*See Katz*, 389 U.S. at 360 (Harlan, J., concurring); *see also Bond v. United States*, 529 U.S. 334, 338 (2000); *California v. Ciraolo*, 476 U.S. 207, 211 (1986). "[A]n actual trespass [was] neither necessary *nor sufficient* to establish a constitutional violation." *Karo*, 468 U.S. at 713 (emphasis added); *see also supra* note 11. As a result, a reasonably well trained law enforcement officer would have known that the installation of the GPS unit upon the undercarriage of Harry Katzin's vehicle was a Fourth Amendment "search" only in the event that it was apparent that Harry Katzin had a reasonable expectation of privacy in that area.

Of course, Harry Katzin had a reasonable expectation of privacy with respect to the interior of his vehicle; even if that privacy interest was diminished. *See Cardwell*, 417 U.S. at 589–90. But it would have been objectively reasonable for a law enforcement officer to conclude that he lacked a reasonable expectation of privacy in the exterior—specifically, the undercarriage—of the vehicle.

In *Cardwell v. Lewis*, 417 U.S. 583 (1974) and again in *New York v. Class*, 475 U.S. 106 (1986), the Supreme Court made it quite clear that persons lack a reasonable expectation of privacy in the exterior of their automobiles. *See Cardwell*, 417 U.S. at 591 –92 ("With the search limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, we fail to comprehend what expectation of privacy was infringed."); *Class*, 475 U.S. at 114 (plurality opinion) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.'" (citing *Cardwell*, 417 U.S. at 588–89)). In light of this long-standing Supreme Court precedent, the officers

would have had an "objectively reasonable good-faith belief" that Harry Katzin lacked a reasonable expectation in the exterior of his vehicle, and thus that "their conduct was lawful" when they installed the GPS on the car's undercarriage. *Davis*, 131 S. Ct. at 2427 (internal quotation mark omitted).[17]

Again, I make no claim that *Class* or *Cardwell* qualify as "binding appellate precedent" under *Davis*. That does not end the inquiry, however. Instead, what resolves the inquiry is that, in light of the pre-*Jones* legal landscape, the law enforcement officers here could have reasonably concluded that Supreme Court precedent authorized, or at the very least affirmed the constitutionality of, their conduct. Regardless of

---

[17] The majority is correct to point out, in its brief discussion of *Class*'s applicability to our warrant analysis, that *Jones* dismissed *Class*'s relevancy with regard to whether a search occurs where officers install and subsequently track a GPS device upon an automobile. *See* Maj. Op. at 34 n.14. That does not mean, however, that *Class* and *Cardwell* are similarly irrelevant to our good-faith analysis. At the time the officers were acting, those two cases were generally understood to stand for the proposition that one lacks a reasonable expectation of privacy in the exterior of his automobile. *See, e.g.*, *Pineda-Moreno*, 591 F.3d at 1215 ("[T]he undercarriage of a vehicle, as part of its exterior, is not entitled to a reasonable expectation of privacy."); *United States v. George*, 971 F.2d 1113, 1119–20 (4th Cir. 1992) ("There is thus little question in the aftermath of *Cardwell* and *Class* that one does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways.").

36

the alternate facts in *Class* and *Cardwell*, those cases' holdings and principles of law, which would have been known by a reasonably well trained law enforcement officer, made it clear that before *Jones* a person lacked a reasonable expectation of privacy in the exterior of his automobile, and, thus, a simple trespass thereupon by law enforcement officers would not have constituted a "search." As a result, I cannot conclude that the law enforcement officers' conduct in installing the GPS device to the undercarriage of Harry Kaztin's vehicle was a "'deliberate,' 'reckless,' or 'grossly negligent' disregard of Fourth Amendment rights." *Davis*, 131 S. Ct. at 2427 (quoting *Herring*, 555 U.S. at 144).

**B.**

Similarly, the officers here were acting with an objectively reasonable good-faith belief that their warrantless use of the GPS to monitor Harry Katzin's vehicle while it traversed public roads over the course of two days was constitutionally permissible.

First, the majority distinguishes, and thus dismisses, *Knotts* and *Karo* on their facts. Paramount, the majority says, are that facts that "[n]either case involved a physical trespass onto the target vehicle; in both cases the police placed the beeper inside of a container which was then loaded into the target vehicle by the driver . . . . [and] both *Karo* and *Knotts* addressed the use of beepers, which . . . are markedly different from GPS trackers." Maj. Op. at 40. True, these factual distinctions would matter much if the Government were arguing that *Knotts* and *Karo* qualified as "binding appellate precedent" under *Davis*. But, as discussed above, that is not the Government's argument. A reasonably well

37

trained police officer, acting in December 2010, would have thought *Knotts* and *Karo* to have meant exactly what they said with regard to GPS and GPS-like surveillance. Those cases made absolutely clear that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," *Knotts*, 460 U.S. at 281, because the "movements of the automobile" while on public roads "could have been observed by the naked eye." *See Karo*, 468 U.S. at 713–14. Thus, the Fourth Amendment simply was not implicated. *See id.*; *see also Sparks*, 711 F.3d at 65 ("After *Knotts* . . . [it was] settled . . . [that] using a beeper to monitor a person's movements in a car on public roads did not implicate the Fourth Amendment, because there was no privacy interest to be infringed."). At the time the officers were acting, *Knotts*'s holding was familiar and sacrosanct. *See, e.g.*, *Marquez*, 605 F.3d at 609; *Garcia*, 474 F.3d at 996; *McIver*, 186 F.3d at 1126.

This may well be enough to justify the officers' good faith in performing warrantless GPS surveillance of Harry Katzin's automobile. *See Sparks*, 711 F.3d at 66–67 (concluding good-faith exception applied to GPS surveillance because *Knotts* "clearly authorized the agents to use a GPS-based tracking device"). But I need not answer that question, because "good faith" is determined in light of "all of the circumstances." *Leon*, 468 U.S. at 922 n.23; *see also Herring*, 555 U.S. at 145. In this case, in addition to *Knotts* and *Karo*, the officers were also guided, and reasonably relied, upon a "uniform treatment" of "continuous judicial approval" across the federal courts with regard to the constitutionality of warrantless GPS use. *See Peltier*, 422 U.S. at 541–42; *see also* Caleb Mason, *New Police*

38

*Surveillance Technologies and the Good-Faith Exception: Warrantless GPS Tracker Evidence After* United States v. Jones, 13 NEV. L. J. 60, 65 (2012) (before *Jones*, "everyone thought" that the "key fact" from *Knotts* and *Karo* "was that the cars were being monitored while they were on public roads, where anyone could see them"). Specifically, nearly every federal court to consider the issue had concluded that a warrant was unnecessary to conduct GPS surveillance, the sole exception being *Maynard*.[18]

Consequently, in light of *Knotts* and *Karo*, and their subsequent treatment, it was "objectively reasonable" for the law enforcement officers to have believed that the use of the GPS device to conduct surveillance upon Harry Katzin's vehicle while it moved along public roadways was not a Fourth Amendment "search." *See Knotts*, 460 U.S. at 282–83 (explaining that where one "travel[s] over the public streets he voluntarily convey[s] to anyone who want[s] to look the fact that he [is] traveling over particular roads in a particular direction, the fact of whatever stops he ma[kes], and the fact of his final destination"); *Ciraolo*, 476 U.S. at 224 (Powell, J., dissenting) ("Comings and goings on public streets are public matters, and the Constitution does not disable police from observing what every member of the public can see."); *id.* at 215 (majority opinion) ("The Fourth Amendment simply does

---

[18] The majority claims that, under the logic of my analysis, *Maynard* should have put the law enforcement officers "on notice that [GPS] devices *could* implicate Fourth Amendment rights." Maj. Op. at 54 n.24 (alteration, omission, and internal quotation marks omitted). For the reasons set forth at *infra* Part V, I disagree.

not require the police traveling in the public . . . to obtain a warrant in order to observe what is visible to the naked eye.").

## C.

Moreover, two additional considerations bolster my conclusion that the law enforcement officers here acted with "an objectively 'reasonable good-faith belief' that their conduct was lawful." *Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909).

First is the fact that the warrantless installation of the GPS device and its subsequent surveillance complied with the commentary to Rule 41(b) of the Federal Rules of Criminal Procedure, which states that "[i]f . . . the officers intend to install and use [a GPS] device without implicating any Fourth Amendment rights, there is no need to obtain [a] warrant." FED. R. CRIM. P. 41(b) advisory comm. note (2006). As discussed, it was objectively reasonable for the officers to have concluded that Harry Katzin lacked a reasonable expectation of privacy in the undercarriage of his automobile, and the GPS device was never used to conduct surveillance in any area but the public roadways upon which the car was traveling. Thus, a reasonable reading of this commentary would have led to the equally reasonable conclusion that the officers here did not require a warrant to act.[19]

---

[19] Although the Government neglected to argue this fact, similar arguments have been made in similar cases, including cases heard by District Courts in this Circuit. *See, e.g.*, *United States v. Lopez*, __ F. Supp. 2d __, C.A. No. 10-cr-67(GMS), 2013 WL 3212347, at *3 (D. Del. June 26, 2013); *United States v. Willford*, __ F. Supp. 2d __, Crim. No.

Second, the law enforcement officers consulted with an Assistant United States Attorney before conducting the installation of the GPS unit and the subsequent surveillance. (*See* Appellant Br. at 56.) More than likely, that attorney's discussion with the officers about the constitutionality of their conduct proceeded along similar lines as my analysis above. But, important for our purposes, the fact that the officers consulted with a government attorney before acting, who then approved their desired course of action, although certainly not dispositive on its own, is a consideration weighing in favor of the conclusion that "[a] reasonable officer would . . . have confidence in the validity of the [search]." *Tracey*, 597 F.3d at 153; *see also Otero*, 563 F.3d at 1134; *Fama*, 758 F.2d at 837.

Thus, taking into consideration the Supreme Court jurisprudence, the near unanimous treatment by the federal

---

ELH-11-0258, 2013 WL 2552446, at *20 (D. Md. June 7, 2013). Furthermore, the majority claims this commentary is a codification of "nothing more than the unremarkable proposition that the police need not obtain a warrant if their action does not violate the Fourth Amendment." Since *Maynard* put law enforcement "on notice" that GPS use could affect Fourth Amendment rights, the majority reasons, the Rule has no substantive effect on the good-faith analysis. Maj. Op. at 54 n.24. Again, as I discuss at *infra* Part V, I do not read *Maynard* to have such an effect, and, thus, I am at a loss to see how a reasonably well trained law enforcement officer, acting at the time the officers did in this case, could have known that their actions "implicat[ed] . . . the Fourth Amendment."

41

courts to have addressed the issue, the commentary to Rule 41(b) of the Federal Rules of Criminal Procedure, and the fact the officers here consulted with an Assistant United States Attorney, it is clear that the officers were not acting with "'deliberate,' 'reckless,' or 'grossly negligent' disregard of Fourth Amendment rights," *Davis*, 131 S. Ct. at 2427 (quoting *Herring*, 555 U.S. at 144), when they conducted the warrantless installation and subsequent surveillance of the GPS device upon Harry Katzin's automobile, but were instead acting with "an objectively 'reasonable good-faith belief' that their conduct [was] lawful." *Id.* (quoting *Leon*, 468 U.S. at 909).

## V.

The majority holds otherwise, because, in its view, the difference between the beepers used in *Knotts* and *Karo* and the GPS device used in this case is "one of kind, not degree," Maj. Op. at 47 n.20, which makes all the "differen[ce]." Furthermore, the majority chides reliance on *Knotts*, *Karo*, and the relevant cases from our sister circuits because *United States v. Maynard*, which held that prolonged GPS surveillance *was* a search and *did* require a warrant, put the officers on notice "that such devices could 'implicat[e] . . . Fourth Amendment rights.'" Maj. Op. at 54 n.24. I disagree that these two considerations render the officers' conduct here objectively unreasonable and sufficiently culpable so as to incur the wrath of the exclusionary rule.

Certainly, the technological difference between the beepers of the 1980s and modern GPS devices is a consideration to take into account in determining whether the law enforcement officers were acting with an objectively

42

reasonable belief their actions were lawful. Modern "GPS units do not require police to follow the suspect visually, do not allow the driver to detect tailing, and do not require an expensive deployment of equipment and manpower." *United States v. Hernandez*, 647 F.3d 216, 221 (5th Cir. 2011); *see also Maynard*, 615 F.3d at 565 (opining that "practical considerations prevent visual surveillance from lasing [as] long" as "the use of the GPS in [that] case"); *Pineda-Moreno*, 617 F.3d at 1126 (Kozinski, C.J., dissenting from denial of rehearing en banc) ("[T]here's no hiding from the all-seeing network of GPS satellites that hover overhead, which never sleep, never blink, never get confused and never lose attention.").

Admittedly, this makes GPS devices different from the beepers used in *Knotts* and *Karo*. Beepers do not independently determine their geographic location, but, instead, "emit[] periodic signals that can be picked up by a radio receiver" within range of the beeper's radio transmitter. *See Knotts*, 460 U.S. at 277. Beepers thus aid law enforcement by assisting officers in visual surveillance of a suspect, rather than doing the work of the officer altogether. *See Pineda-Moreno*, 617 F.3d at 1124 (Kozinski, C.J., dissenting from the denial of rehearing en banc) ("[M]odern [GPS] devices . . . can record the car's movements without human intervention—quietly, invisibly, with uncanny precision.").

Notwithstanding these technological differences, "[i]t is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." *Karo*, 468 U.S. at 712. "Certainly, a GPS tracker is more capable than a beeper, 'but nothing inheres in the technology to take it out of

43

*Knotts*'s holding.'" *Sparks*, 711 F.3d at 66 (footnote omitted) (quoting *United States v. Cuevas-Perez*, 640 F.3d 272, 278 (7th Cir. 2011) (Flaum J., concurring)); *see also United States v. Andres*, 703 F.3d 828, 835 (5th Cir. 2013) (finding that "any possible technological differences between a 1981 'beeper' and the GPS device" insufficient because the two devices' "functionality [were] sufficiently similar"); *United States v. Jones*, 625 F.3d 766, 768 (D.C. Cir. 2010) (Sentelle, C.J., dissenting from the denial of rehearing en banc) ("There is no material difference between tracking the movements of the *Knotts* defendant with a beeper and tracking the *Jones* appellant with a GPS.").

Regardless of the technological differences, the GPS reported to law enforcement no more information than that which the officers could have obtained through pure visual surveillance. *Jesus-Nunez*, No. 1:10-cr-00017-01, 2010 WL 2991229, at *3; *see also Cuevas-Perez*, 640 F.3d at 275 (dismissing as immaterial the increased accuracy of GPS devices since "real-time information is exactly the kind of information that drivers make available by traversing public roads"). Every piece of data the GPS unit provided law enforcement officers could have been otherwise obtained by a police officer tracking Harry Katzin's vehicle on foot or in his squad car on a public street;[20] by an officer keeping an eye on

---

[20] *See California v. Greenwood*, 486 U.S. 35, 41 (1988) ("[T]he police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public."); *Texas v. Brown*, 460 U.S. 730, 740 (1983) (plurality opinion) ("The general public could peer into the interior of Brown's automobile from any number of angles; there is no reason

44

the vehicle through use of a telescope or binoculars, or utilizing a flashlight or spotlight so as to not lose the car under the shadow of the night;[21] or by an officer utilizing an airplane or a helicopter to follow the vehicle along the public roadways.[22]

---

[the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen."); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.").

[21] *See Brown*, 460 U.S. at 739–40 (plurality opinion) ("It is . . . beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."); *United States v. Lee*, 274 U.S. 559, 563 (1927) ("For aught that appears, the cases of liquor were on deck and, like the defendants, were discovered before the motorboat was boarded. Such use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution.").

[22] *See Florida v. Riley*, 488 U.S. 445, 448–449, 451–52 (1989) (an officer "circl[ing] twice over respondent's property in a helicopter at the height of 400 feet" was not a search because "the police may see what may be seen from a public vantage point where they have a right to be" (alteration and internal quotation marks omitted)); *California v. Ciraolo*, 476 U.S. 207, 213–14 (1986) ("Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed.").

The efficiency or efficacy of an officer's natural senses often benefit from advances in technology. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 231 (1986) (changes in technology not only "enhance[] industrial process, and indeed all areas of life," but "they have also enhanced law enforcement techniques"). But "[t]he mere fact that human vision is enhanced" by some form of technological advance, by itself, "does not give rise to constitutional problems." *Id.* at 238; *see also Silverman v. United States*, 365 U.S. 505, 513 (1961) (Douglas, J., concurring) ("[N]either should the command of the Fourth Amendment be limited by nice distinctions turning on the kind of electronic equipment employed."). Again, "[i]t is the exploitation of technological advances that implicates the Fourth Amendment, not their mere existence." *Karo*, 468 U.S. at 712. "Nothing in the Fourth Amendment prohibit[s] the police from augmenting the sensory facilities bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Knotts*, 460 U.S. at 282. The information obtained through use of the GPS was information otherwise observable by the naked eye. *See id.* at 281–82. The GPS unit simply made it easier for the law enforcement officers to obtain. *See id.* at 284 ("Insofar as respondent's complaint appears to be simply that scientific devices such as beepers enabled police to be more effective in detecting crime, it simply has no constitutional foundation."). And at the time the officers here acted, it was indubitable that Harry Katzin lacked any reasonable expectation of privacy in the information the GPS unit was procuring. *See id* at 281.[23] Thus, even taking into

---

[23] Today, the question remains open as to whether *Jones* effectually abrogated *Knotts*'s conclusion that persons lack any reasonable expectation of privacy in the information

consideration the technological difference between the beepers used in *Knotts* and *Karo* and the GPS units used in this case, the officers were clearly not "exploit[ing]" GPS technology in a way so as to put them on notice that their

---

the GPS unit was procuring. The only question answered in *Jones* was whether a search had occurred through the installation and subsequent use of the GPS device. Thus, the Fourth Amendment implications of the information obtained by the GPS surveillance, alone, were not discussed. *Jones* did state that "*Knotts* noted the 'limited use which the government made of the signals from [that] particular beeper; and reserved the question whether 'different constitutional principles may be applicable' to 'dragnet-type law enforcement practices' of the type that GPS tracking made possible [in that case]." *Jones*, 132 S. Ct. at 952 n.6 (citations omitted). But Justice Scalia's opinion for the majority refrained from altering *Knotts*'s conclusion that "the information obtained—the location of the automobile carrying the [beeper] on public roads . . .—had been voluntarily conveyed to the public," and was therefore not a search. *Id.* at 951–52. Nonetheless, five justices wrote or joined the concurring opinions in *Jones*, all of which seemed to endorse the so-called "mosaic" theory expressed in *Maynard*—which would unequivocally limit the holding in *Knotts* to apply in only short-term surveillance. *See* Orin Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311, 326 (2012). This question does not need to be answered today; but emphasizes the major shift caused by *Jones* in Fourth Amendment law, and the vastly different legal regime under which the law enforcement officers here were acting.

47

actions were unconstitutional.[24] *See Cuevas-Perez*, 640 F.3d at 279–80 (Flaum, J., concurring) (opining before *Jones* that "[t]he holding of *Knotts* is that a person has no expectation of privacy in movements from one place to another on public

---

[24] The majority concludes otherwise, alluding that my preferred disposition would "leave [persons] at the mercy of advancing technology." Maj. Op. at 48 n.20 (citing *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001)). This case is categorically distinct from *Kyllo*. In *Kyllo*, the officers utilized technology to observe infrared radiation, which is otherwise invisible to the naked eye. 533 U.S. at 29. Furthermore, the officers utilized that technology in order to determine the relative temperature of the interior of a home, an area entitled to almost absolute protection under the Fourth Amendment. *Id.* at 29–30; *see also Florida v. Jardines*, 569 U.S. __, 133 S. Ct. 1409, 1414 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). In contrast, the use of the GPS device in this case provided information otherwise observable by the naked eye on a public street. What is more, although the Court found it "foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology," *Kyllo* made much of the fact that the technology used in that case was "not in general public use." 533 U.S. at 33–34. Alternatively, GPS technology is widespread, and one need look only on the dashboard of his vehicle or the screen of his cellular telephone to spot one. *Kyllo*'s concerns, of course, arise in all Fourth Amendment cases dealing with advanced technology. But it is safe to say that those concerns are not implicated by out facts.

roads; by its terms, the holding is indifferent to the technology used to observe those movements").

Nor does the existence of *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) affect the officers' reasonable belief that their conduct was lawful. First, the *Maynard* holding was based on the fact that the GPS surveillance conducted in that case lasted for four weeks, which allowed law enforcement to obtain "information not revealed by short-term surveillance." *See Maynard*, 615 F.3d at 562; *Cuevas-Perez*, 640 F.3d at 274 ("[T]he *Maynard* court repeatedly distinguished the surveillance at issue there from surveillance during a single journey."). Conversely, the GPS tracking in this case lasted for only two days, (*see* Appendix at 112–15, 143–50.), and Appellees make no argument that the information obtained by the GPS device "reveal[ed] more" about their personal lives "than does any individual trip viewed in isolation." *Maynard*, 615 F.3d at 562.[25] Besides,

---

[25] The majority claims this is a distinction without a point, because "when the police attached their GPS device to Harry Katzin's van, they had no way of knowing when the next Rite Aid robbery would take place"; thus characterizing the GPS tracking here as "a long-term surveillance project." *See* Maj. Op. at 50 & n.22. But for purposes of whether a Fourth Amendment violation occurred it matters not what law enforcement officers *could have done* but what they *did do*. *See Dow Chem. Co.*, 476 U.S. at 238 n.5 ("Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations. '[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment.'" (alteration in original) (quoting *Karo*, 468 U.S. at 712)); *cf.*

"*Knotts* gave scant reason to think that the duration of the tracking in that case was material to the Court's reasoning." *Sparks*, 711 F.3d at 67.[26]

---

*United States v. Jacobsen*, 466 U.S. 109, 122 (1984) ("The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.").

[26] The *Knotts* Court did say, however, that "if dragnet-type law enforcement practices" such as "twenty-four hour surveillance of any citizen of this country . . . without judicial knowledge or supervision," "should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." *Knotts*, 460 U.S. at 283–84. But merely acknowledging that "different constitutional principles may be applicable" does not imply what those principles may be and how they impact the relevant analysis. *See Shelby Cnty. v. Holder*, 570 U.S. __, 133 S. Ct. 2612, 2637 n.3 (2013) (Ginsburg, J., dissenting) ("Acknowledging the existence of 'serious constitutional questions' does not suggest how those questions should be answered." (citation omitted)). Nonetheless, I seriously doubt that the "dragnet-type law enforcement practices" referred to by the *Knotts* Court, whatever they may be, are akin to what occurred in this case, where law enforcement officers had evidence to suggest that Harry Katzin was a serious criminal; evidence his attorney admitted at argument gave rise to probable cause. (*See* Oral Arg. Trans. at 43:7–16.)

Furthermore, consider this hypothetical: Imagine, under facts identical to our case, the D.C. Circuit's *Maynard* decision was, instead, the only case holding that GPS use was *not* a search and *did not* require a warrant. If, under those circumstances, the officers claimed to rely only upon *Maynard* for a reasonable belief that their conduct complied with the Constitution, that consideration would weigh more toward a finding of law enforcement culpability. But, here, we are presented with the alternative, and *Maynard* was the only *holding* (i.e., not a dissent or concurring opinion) from *any* court at the time the officers executed the warrantless GPS surveillance that considered their conduct illegal. As a result, the fact that Appellees are pointing to *Maynard* as the only case that said the law enforcement officers *could not do* what they did is a consideration that weighs in the officers' favor.

**\*\*\*\***

Under the majority's rule, where law enforcement officers engage in "extrapolat[ion] [of] their own constitutional rule," or where officers "assum[e] that their own self-derived rule sanction[s] their conduct," those officers act with sufficient culpablity so as to justify application of the exclusionary rule. Maj. Op. at 51. I agree that "[t]he justifications for the good-faith exception [may] not extend to situations in which police officers have interpreted ambiguous precedent." *Sparks*, 711 F.3d at 67 (quoting *Davis*, 598 F.3d at 1267). But that is not the case here, "where new developments in the law have upended the settled rules on which police relied." *Id.* at 68.

51

Before *Jones*, all but one federal court of appeals to address the issue unequivocally concluded that *Knotts*, *Karo*, and other relevant Supreme Court precedent sanctioned the law enforcement conduct that occurred here. These Fourth Amendment principles, upon which the law enforcement officers relied in this case, were settled maxims of constitutional jurisprudence, some of them governing law enforcement conduct for decades. The majority, viewing this case through *Jones*-colored lenses, rules with the benefit of a hindsight that was unavailable to the officers here.

*United States v. Jones* changed things; and changed them in a way very few—if any at all—predicted. The exclusionary rule does not require us to punish the law enforcement officers here for failing to predict that sea change.[27] The District Court below put it quite aptly:

---

[27] I have serious reservations about the implications of the majority's ruling in this case. Nevertheless, I admit my position might encourage some law enforcement officers to bend and twist existing precedent and legal principles to their breaking points. In some cases, law enforcement "reliance" could be marginal at best.

But I have confidence that courts are aptly suited to discern the true "good-faith actors" from the bad; and that, in circumstances such as those presented in this case, we will be able to definitively answer the question of whether law enforcement officers were acting with objectively reasonable good faith. Rulings that officers come up short will help deter undesirable law enforcement conduct.

[T]he Court hastens to emphasize that it has no concern that the prosecutorial and law enforcement personnel here were undertaking their work in this investigation and prosecution in a calculated or otherwise deliberately cavalier

---

The majority recognizes that "applying existing precedential framework to subtle factual permutations is something that police officers—and other law enforcement personnel—do all the time." Maj. Op. at 57 n.27. But while insisting that its opinion does not "curtail such practices," the majority punishes the law enforcement officers in this case for performing that exact practice. There may not have been a case from our Circuit or the Supreme Court specifically detailing what the officers should have done in the particular circumstances presented here. But there were cases from the Supreme Court that came very close; close enough, in fact, that some of our sister courts found them to be controlling as precedents in situations similar to the case at bar.

Obviously there is not enough time, history, or reporter space to answer every single Fourth Amendment question. As a result, the exclusionary rule has developed to provide a remedy on the backend. Often the hurried judgments of an officer, however well intentioned, simply do not comply with constitutional rights. But as a matter of Fourth Amendment policy, I would rather allow the officer more freedom in performing his job—particularly where the answer to the "appl[ication of] existing precedential framework to subtle factual permutations" is so readily apparent as it was in this case—than protect courts from overly burdensome suppression motions. Ruling on suppression motions is part of our job.

> or casual manner in the hopes of just meeting
> the outer limits of the constitutional contours of
> the Katzins' rights. Indeed, these actors could
> well profess surprise at the specific outcome of
> *Jones*.

*United States v. Katzin*, Crim. No. 11-226, 2012 WL 1646894, at \*10 n.15 (E.D. Pa. May 9, 2012). Regardless of this seemingly dispositive conclusion, the District Court found, and the majority now affirms, that the exclusionary rule requires suppression of the evidence obtained by such non-culpable law enforcement conduct.

Doing so renders the exclusionary rule a "strict-liability" regime, something which it emphatically is not. *See Davis*, 131 S. Ct. at 2429. The exclusionary rule is "a 'prudential' doctrine," *id.* at 2426 (quoting *Scott*, 524 U.S. at 363), which requires a "rigorous weighing of [the] costs and deterrence benefits," *id.* at 2427, lest a "guilty and possibly dangerous defendant[] go[es] free," *Herring*, 555 U.S. at 141. As a society, we willingly swallow that "bitter pill" when we must. *Davis*, 131 S. Ct. at 2427. But under the circumstances present in this case, I do not find the law enforcement conduct to be "sufficiently culpable" so that the benefit from deterring that conduct "is worth the price paid by the justice system," *John*, 654 F.3d at 417, even if it might create a marginal incentive for officers to "err on the side of constitutional behavior." *United States v. Johnson*, 457 U.S. 537, 561 (1982). Marginal deterrence is not the trigger of the exclusionary rule, *Herring*, 555 U.S. at 141; law enforcement culpability, and, thus, the opportunity for appreciable deterrence is. *Leon*, 468 U.S. at 909; *John*, 654 F.3d at 417. In consequence, because I find that the law enforcement

54

officers here lacked the requisite culpability in their actions so as to justify application of the exclusionary rule, I respectfully dissent from the majority's conclusion to the alternative. I would reverse the District Court below.